HAROLD HOLBERG, Respondent, *v.* WESTCHESTER RACING ASSOCIATION, Appellant.

Supreme Court, Appellate Term, First Department, February 13, 1945.

*Martin A. Schenck, Harold C. McCollom* and *Kenneth W. Greenawalt* for appellant.

*Irving I. Sternberg* for respondent.

HAMMER, J.  The plaintiff-respondent has recovered a judgment for damages against the Racing Association, defendant-appellant, in an amount equal to a winner's share in the pool on the winning horse " Charlene ", No. 3 in a race at Belmont Park, New York, on September 21, 1943.  The action was tried, submitted to the jury and decided on the theory of damages for breach of contract.  Defendant has appealed and the appeal must be decided on that same theory.  Accepting plaintiff's story he handed the agent in window 181 two $50 bills and requested two tickets on No. 3 but the seller punched out two tickets on No. 4 which, over strenuous objection, plaintiff finally took after protest and waited for the winner of the race, making claim when No. 4 did not win and No. 3 did win.

In New York there can be no such thing as a valid oral wagering contract since the Pari-Mutuel Revenue Law (L. 1940, ch. 254) makes no provision therefor and any wagering contract on horse races, other than those made in the manner prescribed by that law, is illegal and invalid. There can be no valid pari-mutuel bet or wager independent of a pari-mutuel ticket. The ticket not only is essential but is the contract itself. Moreover, under the rules of the State Racing Commission regulating the conduct of pari-mutuel betting (see L. 1940, ch. 254, § 7) " betting other than through the ' tote ' [totalizator] is strictly prohibited " for the obvious reason that it is illegal (Rules Governing the Conduct of Pari-Mutuel Betting, rule 6). The " tote " referred to is, as is well known, the mutuel calculator and indicator referred to in the statute (L. 1940, ch. 254, § 6). There is such a machine at every race track in this State and thereon are indicated automatically the sales made through the ticket vending machines and the approximate odds on each horse as the betting progresses.

Any other bet or wagering agreement, oral or otherwise, is illegal (N. Y. Const., art. I, § 9; Penal Law, § 991) as by the amendment of section 9 of article 1, adopted in 1939, effective January 1, 1940, " pari-mutuel betting on horse races as may be prescribed by the legislature " is the only exception from the prohibition against gambling. The Legislature in enacting chapter 254 of Laws of 1940 known as the Pari-Mutuel Revenue Act of 1940, permitted and strictly regulated pari-mutuel betting. (*Matter of Stewart* v. *Department of State,* 174 Misc. 902, 903, 904, affd. 260 App. Div. 979, motion for leave to appeal to Court of Appeals denied 261 App. Div. 851.) Under that law there is no wagering contract, agreement or bet between the Racing Association and the patron. The transaction is between the participants in the pari-mutuel pools, the odds and terms thereof being determined by the participants according to the amount of their payments into the pool. In mutuel betting each participant lays a fixed sum on the contestant he selects, and those who choose the winner, divide the entire stake, less the percentage for management or furnishing the pool tickets. The Racing Association is licensed by the State, manages pari-mutuel betting, providing equipment for issuing or vending pari-mutuel tickets (L. 1940, ch. 254, § 4), and under the law is to " distribute to the patrons of pari-mutuel pools conducted by it all sums due upon presentation of the winning tickets held by them " (L. 1940, ch. 254, § 5) and to " distribute all sums deposited in any pari-mutuel pool to the winners thereof,

less ten percentum of the total deposits plus the breaks''
(L. 1940, ch. 254, § 9). The Racing Association is the law's
administrative agent for collecting and distributing the pool.
(*Aliano* v. *Westchester Racing Assn.*, 265 App. Div. 225, 228.)
The Association, unlike a book-maker, does not act on personal
responsibility or make or accept a wager. If it did it would
violate the Penal Law. It is merely an agency legally made
by statute for taking, holding and distributing the money waged
by the participants who are the parties to the wagering trans-
action. The statute is for the benefit of the State to derive
reasonable revenue from the betting and to promote agriculture
generally and improvement of the breeding of horses particu-
larly in the State (L. 1940, ch. 254, § 2). The State Racing
Commission has prescribed rules regulating pari-mutuel betting.
Among those set forth on the program were the following:

"1. HOW TO ASK FOR TOTE TICKETS — Please call the NUMBER
of the horse FIRST, then the quantity of tickets desired.

"2. SPECIAL NOTICE — BY ORDER OF THE NEW YORK STATE
RACING COMMISSION — Payment on Winning Tickets will be
made only upon presentation and surrender of the ticket.

"3. MAKE ALL WAGERS EARLY — The Westchester Racing
Association is not responsible for transactions not completed
before the ' tote ' machines are locked.

"4. BETTING OTHER THAN THROUGH ' TOTE ' PROHIBITED.''

Although the action was brought for damages for breach of
contract and the complaint was amended upon the trial to
allege an additional cause of action for damages for negligence,
it seems clear that actually the winnings of a horse race are
sought. No doubt plaintiff-respondent adopted the forms of
action pursued for the purpose of evading the limitations
imposed by law on actions involving wagers and gambling.

While a bet on a horse race is a contract (27 C. J., Gaming,
§ 35 *et seq.; Nielsen* v. *Donnelly,* 110 Misc. 266), a mistake as
to the subject matter of any agreement results in no contract.

The parties must have a distinct intention common to both
without difference or doubt. Until they understand alike and
assent to the same thing at the same time and their minds
meet on all the terms, there can be no assent and no contract.
(17 C. J. S., Contracts, § 144, subd. b.)

In *Sidney Glass Works* v. *Barnes & Co.* (86 Hun 374, 377)
the rule is stated as follows: "It seems to be well settled that
if one party makes to another an offer by letter and the offer
is of a character which implies nothing to be done by the latter
except to assent or decline, and he by letter accepts, adding no

qualification, condition or reservation, there is a mutual consent, and a contract is created by such letters. But, even where there is an acceptance, if it is not of the exact thing offered, or if it is accompanied by any conditions or reservations, however slight, then no contract is made, and the proposition to accept with such modifications is a rejection of the offer. (Bishop on Cont. §§ 176, 179; 1 Pars. on Cont. 477; *Myers* v. *Smith,* 48 Barb. 614; *Brown* v. *The New York Central R. R. Co.,* 44 N. Y. 79; *Nundy* v. *Matthews,* 34 Hun. 74; *Myers* v. *Trescott,* 59 id. 395; *Barrow Steamship Co.* v. *Mexican Central R. R. Co.,* 134 N. Y. 15; *Marschall* v. *Eisen Vineyard Co.,* 28 N. Y. Supp. 62.) '' (See, also, 1 Clark on New York Law of Contracts, §§ 5, 8; 1 Williston on Contracts [Rev. ed.], §§ 20, 23, 64, 66.)

In an agreement of sale the essentials are the same as in other contracts. If the seller understands he is selling one thing and the buyer that he is buying another thing, there can be no contract of sale. (2 Williston on Sales [2d ed.], §§ 5, 653, 654; *Raffles* v. *Wichelhaus,* 2 Hurl. & Colt. 906; *Hecht* v. *Batcheller,* 147 Mass. 335.)

In *Hecht* v. *Batcheller* (*supra,* p. 338) it was stated: '' It is a general rule, that, when parties assume to contract, and there is a mistake as to the existence or identity of the subject matter, there is no contract, because of the want of the mutual assent necessary to create one; so that, in the case of a contract for the sale of personal property, if there is such mistake, and the thing delivered is not the thing sold, the purchaser may refuse to receive it, or if he receives it, may upon discovery of the mistake return it, and recover back the price he has paid. But to produce this result the mistake must be one which affects the existence or identity of the thing sold.''

A wagering transaction or contract is different from all other contracts including those of sales, and remedies under the Sales of Goods Act (Personal Property Law, art. 5) do not seem to be available. The Sales Act was largely a codification of the customs and common law among merchants and the statutes and decisions growing out of same. In substantially all jurisdictions gaming contracts or transactions are either entirely outlawed or when permitted are usually severely regulated and limited by statute. The law does not allow a party to an illegal gaming transaction to recover profits or gains made in carrying out the agreement, but if the cause of action does not involve the question of the validity of the agreement, the money or property deposited may be recovered. Before the wager is decided either party may recover the money or property from

the other party or the stakeholder. If the wager is legal the winner ordinarily may recover the entire stake, or his share thereof, from the stakeholder; but if illegal the winner may recover only his deposit, although as to some wagers, such as a bet on the outcome of a public election, he may be precluded from any recovery by statute or public policy. When there is a statute applicable payment or recovery is usually enforcible only in accordance with the statute and rules adopted under its authority, and a stakeholder making a distribution to wagerers in accordance therewith is relieved from all liability to other claimants. Every claimant of winnings must show compliance with the statute controlling to establish a right to collect therefrom. (38 C. J. S., Gaming, § 39, subd. b.) Business, including buying and selling, is carrying on an occupation connected with the operations of barter, trade, industry, or matters commercial for profit and usually catering to the economic necessaries and welfare of the people or classes thereof. Business may involve speculation but unless the latter is illegal it does not get down to what in modern times is the lower classification known as gambling. Gambling is playing a game of chance for stakes risked on an event, chance or contingency. By nature contracts of business and of sale are essentially different from wagering contracts just as fundamentally legitimate business and barter are essentially different from gambling. The transaction involved in the case before us must be held to be a gamble or wager and to have none of the essential characteristics of business or barter. This clearly appears in the language of the pari-mutuel statute itself. There in prohibiting county or local taxes, the language used is, " on wagers made by patrons in the form of purchasers of pari-mutuel tickets or upon such tickets " (L. 1940, ch. 254, § 9).

According to the plaintiff-respondent, the seller insisted he was selling one thing and the plaintiff-respondent that he was buying another thing, and the plaintiff-respondent took what the seller insisted was sold, waited until after the result of the race showed that had become valueless and then demanded the value the race brought to that which plaintiff-respondent claims he originally ordered. If his story is true and his position sound he has had wagers and action on two horses for the price of one ticket. The right to the winning share does not result from buying a ticket but solely from having the number drawn as winner. The ticket with that number evidence of the right to collect the winning which is held in trust. Under the New York Pari-Mutuel Revenue Law the

winnings are held for the winning tickets for the limited time fixed by law.

It is our opinion the plaintiff-respondent has rights limited strictly by the Pari-Mutuel Law and has not shown breach of contract by defendant-appellant and is not entitled to the judgment rendered. If that be so, defendant-appellant did not enter into the contract claimed by plaintiff-respondent and in law cannot be held liable for the damages awarded for a breach thereof. At the trial defendant-appellant moved for a dismissal, which was denied. Accordingly, the judgment should be reversed, with $30 costs, and the complaint dismissed on the merits, with costs.

SHIENTAG, J., concurs with HAMMER, J.; HECHT, J., concurs in result.

Judgment reversed, etc.