Argued December 2, 1965, affirmed February 16, 1966

# OREGON RACING COMMISSION ET AL *v.* MULTNOMAH KENNEL CLUB

411 P. 2d 63

*Scott M. Kelley,* Special Assistant Attorney General, Portland, argued the cause for appellant. With him on the briefs was Robert Y. Thornton, Attorney General.

*Lamar Tooze, Sr.,* Portland, and *Robert E. Thomp-*

574

*son,* Beaverton, argued the cause for respondent. On the brief were Tooze, Powers, Kerr, Tooze & Peterson, and Thompson & Adams.

Before McALLISTER, Chief Justice, and SLOAN, GOODWIN, HOLMAN and LUSK, Justices.

LUSK, J.

The defendant, Multnomah Kennel Club, has, since 1933, conducted greyhound racing meets as a licensee of the Oregon Racing Commission. As authorized by statute, pari-mutuel betting is engaged in at these meets. A brief description of the system of betting may be found in *City of Portland v. Duntley,* 185 Or 365, 375-376, 203 P2d 640. This suit was brought by the State of Oregon, through the Commission and the State Land Board, to obtain a declaratory decree that large sums of money retained by the defendant over the years for payment to winning wagerers who have never collected their bets should be accounted for and paid either to the Commission or the State Land Board. The court entered a decree for the defendant and plaintiff has appealed.

The case was submitted on a stipulation of facts from which the following appears: Some of the winning tickets sold for pari-mutuel betting have never been presented for redemption and remain unsurrendered and unredeemed. Such tickets are known in the trade as "outs," an abbreviation for "outstanding." The holders of the "outs" are unknown to either the plaintiff or the defendant and payment to a winning wagerer is made only when the wagerer presents a winning ticket. The defendant keeps book records (as required by a regulation of the Commission) disclosing the net amount of the "outs," but the book

records kept prior to 1956 were destroyed when the defendant moved the race meets from Multnomah Stadium to Portland Meadows. The book records for the years 1956 to 1963 show that the dollar value of the "outs" for those years is $102,408.60. The defendant, however, can identify a winning ticket for all races run since the year 1933 to the present time by reference to the printed programs printed each day during the racing season which disclose the identity of the winning dogs and the amount payable on a particular winning ticket. Defendant has redeemed all winning tickets presented to it regardless of the lapse of time; in some instances payment has been made two or more years after the running of the race for which the ticket was presented. No demand was ever made upon the defendant by the Commission or any other agency or representative of the State of Oregon for the payment of the redemption value of the "outs" until October 23, 1963. Since 1959 the following regulation of the commission has been in effect:

"20-520  UNREDEEMED TICKETS. Every Association shall carry on its books an account which shows the total amount due on outstanding unredeemed mutuel tickets which represents the winning tickets not presented for payment."

The book record of "outs" has always been available for the inspection of the Commission which has had full knowledge of the fact that defendant has retained the moneys received on account of "outs," subject to defendant's obligation to pay on presentation the amount called for by any winning ticket. Defendant has, during all the time that it has been licensed, treated the amounts received by it on account of unredeemed tickets as a part of its gross income for all purposes, including the payment of dividends to its

stockholders and beneficial owners, and has included said moneys in its United States income tax and State of Oregon excise tax returns and has paid the required taxes.

Before discussing the specific grounds of the plaintiff's claim, it is well to consider the legal relationship among the three parties concerned in a pari-mutuel betting transaction: The Commission, the licensee and the winning bettor. The entire business is governed by the Oregon Racing Statute, ORS 462.010 to 462.990, and regulations duly adopted by the Commission. ORS 462.060 provides that a licensee conducting any licensed race meet must make percentage payments to the Commission based on the gross receipts of all wagering and, in addition, per diem payments in specified amounts. Regulation 20-435 provides that the "commission," i.e., the amount taken out by the licensee, shall in no event exceed 15 percent of the amounts contributed thereto, breakage excepted, and that the maximum commission shall include the percentage representing the State's revenue exemption. Subsection (2) of this regulation provides that "[a]fter deducting a commission and the 'breaks' as defined in subsection (4)[1] of this section a pari-mutuel pool shall be redistributed to the contributors; * * *." It is further provided by ORS 462.150 (1), hereinafter more fully considered, that "underpayments" shall belong to the State and be paid to the Commission.

The *modus operandi* is tersely described in *Matt-*

---

[1] "All pay-offs shall be computed to the next lower mutiple of 5 cents on the dollar. The odd cents remaining shall not be distributed and shall be known as the 'breaks' and shall be the property of the Association."

*son v. Hollywood Turf Club,* 101 CA2d 215, 219, 225 P2d 276:

> "A licensed track sells tickets and acts as custodian of the funds, which are accumulated in pools for win, place and show; the track takes the share of its partner, the state, and its own share, from the top, and divides what is left in the several pools among the holders of winning tickets."

The word "partner" was no doubt used by the California court in a colloquial, rather than a strictly legal, sense, though the relationship has some of the aspects of a partnership in which the division of the profits is regulated by law.

As between the licensee and the bettors the relationship has been held to be in the nature of contract and not of trustee and *cestui que* trust: *Wise v. Dela. Steeplechase & Race Ass'n,* 28 Del Ch R 532, 45 A2d 547, 165 ALR 830. The balance of the money of the ticket buyers after taking out the licensee's share "is held by the proprietor as a bailee or agent abiding the event of the betting contracts": *City of Louisville v. Churchill Downs,* 267 Ky 339, 346, 102 SW2d 10; the track is a stake holder: *McCall v. State,* 18 Ariz 408, 411, 161 P 893, Ann Cas 1918A 168; it is "a custodian or depositary of money staked, bet, or wagered": *Pompano Horse Club et al v. State of Florida,* 93 Fla 415, 447, 111 So 801, 52 ALR 51. "The racing association is the administrative agent for the collection and distribution of the pool": *Aliano v. Westchester Racing Assn.,* 265 App Div 225, 228, 38 NYS2d 741.

As the stipulation of facts shows, the licensee has no knowledge of the identity of the holders of winning tickets and it pays only upon presentation of a ticket. Due to this unique feature of the pari-mutuel system, it was held, *ex necessitate,* that a bettor whose tickets

were stolen and redeemed by the thief has no cause of action against the licensee: *Mattson v. Hollywood Turf Club*, supra. Similar decisions have been rendered in cases where the bettors inadvertently destroyed their tickets: *Aliano v. Westchester Racing Assn.*, supra; *Carr v. State*, 15 App Div 2d 709, 223 NYS2d 229, and in the case of one who claimed that the ticket seller gave him the wrong tickets: *Holberg v. Westchester Racing Ass'n*, 184 Misc 581, 53 NYS2d 490. The matter is summed up in the following statement by the court in *Aliano v. Westchester Racing Assn.*, supra, 265 App Div at 229:

"The failure of the Legislature to provide for lost or destroyed pari-mutuel tickets was undoubtedly due to a recognition that the nature of the pari-mutuel system of betting necessarily requires a ticket to evidence the bettor's participation in the pool and that payment could not practicably be made without presentation of such ticket."

From all this it follows that, whatever legal label may be used in attempting to categorize the relationships of the various parties concerned, the defendant is in possession—theoretically at least—of a large sum of money as a custodian, depositary, or administrative agent, out of which it is obligated to pay to a large number of unknown bettors the amounts of their winnings, but which it can only pay upon the presentation of their tickets; and that the right of the State to the money, if it have any, must be found either in the racing act itself or in some other provision of statute. It may be added, in the words of the trial judge, that "the likelihood of any significant portion [of the money] being ultimately claimed by the ticketholders is more fanciful than real."

The claim of the State on behalf of the Commission

rests mainly on a section of the racing act relating to underpayments and Regulation 20-515 adopted pursuant thereto. ORS 462.150 (1) reads:

> "If during any race meet conducted under this chapter, there is an underpayment of the amount actually due to any wagerer, the amount of such underpayment shall revert and belong to the state and be paid to the Oregon Racing Commission and become a part of its fund and shall not be retained by the licensee under whose license such race is held."

Regulation 20-515 (1) reads:

> "If at any time it should be discovered that there has been an under-payment in the odds announced and paid, the money shall revert and belong to the State, and be paid to the Commission and not be retained by the fair, association, or licensee sponsoring the race meet."

■ It is contended that an unredeemed ticket represents an "underpayment." No such claim was ever made by the Commission or anyone on its behalf until 1963. If the matter were otherwise doubtful, the administrative construction of the statute shown by the Commission's failure over a period of 30 years to make any such claim would be highly persuasive against its contention. Resort to administrative construction, however, is unnecessary. The word "underpayment" connotes a payment, albeit a payment of less than is due or owing. Such is the only dictionary definition of the word that we have found:

> "1: insufficient payment (as of a tax obligation)"

Webster's Third New International Dictionary.

No payment at all is not an underpayment. The regulation of the Commission by its reference to "an underpayment in the odds announced and paid" recognizes

that something must be paid before there is an underpayment, and the parties have agreed that in practically all cases where an underpayment has occurred it has been caused by an error in computing the odds. In such instances the Commission has collected the difference from the defendant. Unredeemed tickets do not represent underpayments.

■ It is argued, however, that retention of the moneys by the defendant results in a violation of the Commission's regulation limiting the amount which a licensee may take from a pari-mutuel pool. The argument is based on the not unreasonable assumption that very few of the "outs" will ever be presented for payment. While it thus appears that the defendant has received money which it holds for distribution to bettors who will never call for it and which it has been using as its own, paying state and federal income taxes upon it and dividends to its stockholders from it, it must be remembered that the Commission is claiming a right in itself. Merely to show that the defendant is not entitled to the money is not enough to establish the Commission's claim. Like the plaintiff in ejectment, the plaintiff here must show title in itself in order to recover and cannot rely on the weakness of the defendant's title. The Commission's share in the pool, it is to be remembered, is also limited by the statute fixing the amount of license fees, by Regulation 20-435 and the statute giving the Commission the underpayments. The Commission has not succeeded in pointing to any provision of the racing act which entitles it to the money in controversy. In that respect the Oregon statute differs from those in 16 other states regulating pari-mutuel betting at race tracks, all of which provide for payment of the money represented by unredeemed tickets to the state after a

prescribed period of time has elapsed.[2] House Bill 1847, introduced in the 1965 Regular Session of the Oregon Legislative Assembly, had a similar purpose, but failed of passage: Senate and House Journal 1965, p 795.

We turn to the claim of the State on behalf of the State Land Board. Plaintiff says that if the Commission's position is not sustained, the money, or so much of it as may be found to be abandoned property, should be paid over to the Board pursuant to the provisions of the Uniform Disposition of Unclaimed Property Act, ORS 98.302-98.436, enacted in 1957, Oregon Laws 1957, ch 670. The section of the Act particularly invoked is ORS 98.342, which reads:

> "All intangible personal property, not otherwise covered by this Act, including any income or increment thereon and deducting any lawful charges, that is held or owing in this state in the ordinary course of the holder's business and has remained unclaimed by the owner for more than seven years

[2] California Business and Professions Code, Ch 4, Div 8, § 19641
Delaware Code of 1953, Title 28, Ch 3, § 368
Florida Law 550.164
Illinois Rev Stat, Ch 8, Horse Racing Act § 37j
Kentucky Rev Stat 230.340 (3) and 393.095
Louisiana Rev Stat, Title 4, Ch 4, § 163
Maine Rev Stat Ann, Title 8, Ch 13, § 336
Maryland Ann Code, Art 78B, § 23 (b)
Massachusetts Ann Laws, Ch 128A, § 5A
Michigan Stat Ann, Ch 174a, § 18.967 (2)
New Hampshire Rev Stat Ann 284:31
New Jersey Stat Ann 5:5-64
New York, McKinney's Edition on Consolidated Laws of New York, Pari-Mutuel Revenue Law, 65 Unconsolidated Laws, Part 2, § 7963
Rhode Island General Laws, Title 41-4-10
Vermont Stat Ann, Title 31, § 614
West Virginia Code of 1961, Ch 19, Art 23, § 8 [§ 2200 (8) [8]]

after it became payable or distributable is presumed abandoned."

All abandoned property is required by the Act to be paid or delivered to the State Land Board: ORS 98.362.

■ The unclaimed property act was considered in *Realty Associates v. Women's Club et al,* 230 Or 481, 369 P2d 747, but the application of ORS 98.342 was not presented in that case. It is clear from the language of this section and the definition of "owner" in ORS 98.302 (7) as, inter alia, "a creditor" that, within the intent of the statute, an indebtedness is deemed personal property and is presumed abandoned if it remains "unclaimed by the owner for more than seven years after it became payable or distributable." The question is, when does the money represented by a winning pari-mutuel ticket become payable or distributable?

"Payable" is an adjective "of ambiguous import": 70 CJS 202. Its meaning must be determined by reference to the context in which it is found. There are numerous cases in which it has been construed to mean "due." Thus, for example, a bond payable in 20 years after date is said to be by the common acceptation of those terms a bond which matures at the expiration of 20 years, the payment of which neither the payor nor the payee can enforce until the lapse of that period: *City of Alma v. Guaranty Sav. Bank,* 60 F 203, 205 (8th Cir.). And a borrower of money or purchaser of goods immediately owes the money borrowed or the price of the goods, but the debt is not payable until the day arrives which has been agreed upon as the date for payment: *United Brotherhood, etc. v. McLain,* DC Municipal Appeals, 46 A2d 373,

375. See, also, *Crowell v. Harvey Inv. Co.*, 128 Cal App 241, 17 P2d 189.

■■ We are of the opinion that the legislature did not intend that the time for determining that an indebtedness has been abandoned should commence to run before the obligation is due. Some indication of the correctness of this view appears in the use of the word "owing" in one part of the section and "payable" in another. Money may be owing, though not payable. The former word was used to describe property included, the latter to fix the point of time for commencement of the running of the seven-year period. Persuasive evidence, moreover, is found in ORS 98.306, which provides:

> "The following property held or owing by a banking or financial organization is presumed abandoned.
>
> "\* \* \* \* \*
>
> "(3) Any sum payable on checks certified in this state or on written instruments issued in this state on which a banking or financial organization is directly liable, including, by way of illustration but not of limitation, certificates of deposit, drafts, and traveler's checks, that has been outstanding for more than seven years from the date it was payable, *or from the date of its issuance if payable on demand,* unless the owner has within seven years corresponded in writing with the banking or financial organization concerning it, or otherwise indicated an interest as evidenced by a memorandum on file with the banking or financial organization. (Italics added.)
>
> "\* \* \* \* \*"

It is to be noticed that the draftsmen of the Uniform Act recognized in this section the problem arising from instruments payable on demand issued by a banking

or financial organization and took care of it by providing that the seven-year period should begin to run, not when the instrument is payable, that is, when demand is made, but from the date of issuance of the instrument.

■ There is no similar provision in ORS 98.342, the omnibus section. The word "payable" in ORS 98.306 was evidently used in the sense of "due"; otherwise it would have been unnecessary to include the provision relating to instruments payable on demand. And the presumption is that the word was used to express the same meaning in both sections: *Schweigert v. Beneficial Life Ins. Co.*, 204 Or 294, 303, 282 P2d 621, and cases there cited.

■ A pari-mutuel ticket is an instrument payable on demand when the demand is accompanied by presentation of the ticket. It is then that the ticket holder's cause of action accrues: *Wise v. Dela. Steeplechase & Race Ass'n.*, supra, 28 Del Ch R at 534. Only then can it be said that the indebtedness is payable or distributable, and as, presumably, every ticket presented will be paid, no situation now exists or is conceivable, which will make applicable the unclaimed property act to the licensee and the holders of pari-mutuel tickets.

This is not to say that the indebtedness represented by the "outs" may not be in point of fact, though not in law, abandoned property; but no statute determines what disposition should be made of the money. That remains, as it has been from the beginning of pari-mutuel racing in Oregon, a legislative and not a judicial question.

The decree is affirmed.