Argued and submitted July 13, 1999; resubmitted en banc March 9, affirmed by an equally divided court May 31, 2000

## Robyn SUNFLOWER,
*Appellant,*

*v.*

## Matt BLADORN
## and Sharla Bladorn,
*Respondents.*

### (97F 916-356; CA A101790)

1 P3d 513

Frank Wall argued the cause and filed the briefs for appellant.

Mark Passannante argued the cause and filed the brief for respondents.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler and Brewer, Judges.

PER CURIAM

*Edmonds,* J., concurring.

*Landau,* J., dissenting.

**EDMONDS, J.,** concurring.

Plaintiff landlord appeals from a judgment awarding damages to tenants. ORS 19.205(2)(c). Landlord sought judgment against tenants for possession of leased premises through a forcible entry and detainer action (FED) after having given a 30-day termination notice. ORS 105.120(2). Tenants raised the affirmative defense that landlord brought the action in retaliation for tenants' complaints, and they counterclaimed for damages under ORS 90.385 (retaliation), ORS 90.380 (rental of dwelling unit in violation of building or housing code), ORS 90.320 (habitability) and for breach of contract. The trial court's judgment awarded possession and damages to tenants. Plaintiff's appeal turns on whether ORS 90.380(1) requires the governmental agency to affix a statutorily required notice to a dwelling as a predicate to the entitlement to damages under ORS 90.380(2).

The essential facts are not in dispute. The property at issue is a single-family dwelling located in Portland. On May 30, 1997, city inspector Don Ward found that there were 15 violations of the Portland Housing Code concerning the dwelling. On June 10, Ward faxed a notice of the violations to Jackie Snyder, the tenant at that time, and mailed the notice to Carmen Llobregat—the legal owner of the property from whom landlord was buying the property on contract. Snyder subsequently moved out of the dwelling. By the end of June, landlord had received a copy of the notice sent by Ward. He went over the list of violations with tenants before renting them the dwelling without having corrected the violations. No notice of the violations was ever affixed to the dwelling. After several months, tenants complained to landlord about his failure to make the corrections. Landlord then issued tenants a 30-day no-cause notice to terminate the tenancy. Tenants did not quit the premises, and landlord filed this action. After trial, the trial court entered judgment for tenants as indicated above.

Landlord's first three assignments of error concern the trial court's award of damages under ORS 90.380. ORS 90.380(1) provides:

"If a governmental agency has posted a dwelling as unlawful to occupy due to the existence of conditions that violate state or local law and materially affect health or safety, a landlord shall not enter into a rental agreement for the dwelling unit until the conditions leading to the posting are corrected."

ORS 90.380(2) provides for up to twice the actual damages sustained by the tenant as a result of the violation "[i]f a landlord knowingly violates subsection (1)[.]" The central issue raised by the assignments is whether landlord violated ORS 90.380(1) so that tenants could recover the statutory damages provided by subsection (2). Landlord argues that section (1)'s language "if a governmental agency has posted a dwelling as unlawful to occupy" requires that a notice be affixed to the dwelling as a predicate to damages under subsection (2), a requirement that was not met here. He asserts that the legislature intended the statute to impose sanctions for only the egregious action of taking down such a notice and then renting the dwelling. Tenants respond that all of the elements for damages under ORS 90.380(2) are satisfied, once a governmental agency makes a determination of code violations, and a landlord knowingly enters into a rental agreement thereafter without first correcting the violations.

Whether the award of damages under ORS 90.380 is permissible in this case involves a question of statutory interpretation. The first level of statutory analysis requires us to examine the text and context of the statute. The verb "posted" in section (1) could be understood to refer to a notice affixed to a wall, such as to post a public notice. *E.g., Webster's Third New Int'l Dictionary*, 1771 (unabridged ed 1993). Also, "post" can mean "to publish, announce, or advertise by or as if by the use of a placard" or "to enter * * * on a public listing." *Id.* In addition, "post" or "posted" also may commonly mean "denounced" or to invoke censure. *See id.* The dictionary definitions provide alternative meanings of "post," all of which must be considered in the context of the statute as a whole to determine what meaning the legislature intended.

ORS 90.380 is divided into seven sections that apply to different circumstances and provide different remedies.[1]

---

[1] ORS 90.380 provides, in its entirety:

Section (1) establishes an absolute prohibition against a

"(1) If a governmental agency has posted a dwelling as unlawful to occupy due to the existence of conditions that violate state or local law and materially affect health or safety, a landlord shall not enter into a rental agreement for the dwelling unit until the conditions leading to the posting are corrected.

"(2) If a landlord knowingly violates subsection (1) of this section, the tenant may immediately terminate the tenancy by giving the landlord actual notice of the termination and the reason for the termination and may recover either two months' periodic rent or up to twice the actual damages sustained by the tenant as a result of the violation, whichever is greater. The tenant need not terminate the rental agreement to recover damages under this section.

"(3) If, after a landlord and a tenant have entered into a rental agreement, a governmental agency posts a dwelling as unlawful to occupy due to the existence of conditions that violate state or local law, that materially affect health or safety and that:

"(a) Were not caused by the tenant, the tenant may immediately terminate the tenancy by giving the landlord actual notice of the termination and the reason for the termination; or

"(b) Were not caused by the landlord or by the landlord's failure to maintain the dwelling, the landlord may terminate the tenancy by giving the tenant 24 hours' written notice of the termination and the reason for the termination, after which the landlord may take possession in the manner provided in ORS 105.105 to 105.168.

"(4) If the tenancy is terminated, as a result of conditions as described in subsections (1) and (3) of this section, within 14 days of the notice of termination the landlord shall return to the tenant:

"(a) All of the security deposit or prepaid rent owed to the tenant under ORS 90.300; and

"(b) All rent prepaid for the month in which the termination occurs, prorated to the date of termination or the date the tenant vacates the premises, whichever is later.

"(5) If conditions at premises which existed at the outset of the tenancy and which were not caused by the tenant pose an imminent and serious threat to the health or safety of occupants of the premises within six months from the beginning of the tenancy, the tenant may immediately terminate the rental agreement by giving the landlord actual notice of the termination and the reason for the termination. In addition, if the landlord knew or should have reasonably known of the existence of the conditions, the tenant may recover either two months' periodic rent or twice the actual damages sustained by the tenant as a result of the violation, whichever is greater. The tenant need not terminate the rental agreement to recover damages under this section. Within four days of the tenant's notice of termination, the landlord shall return to the tenant:

"(a) All of the security deposit or prepaid rent owed to the tenant under ORS 90.300; and

"(b) All rent prepaid for the month in which the termination occurs, prorated to the date of termination or the date the tenant vacates the premises, whichever is later.

"(6)(a) A landlord shall return the money due the tenant under subsections (4) and (5) of this section either by making the money available to the

landlord from renting to *prospective* tenants a dwelling that has been "posted" by a governmental agency as unlawful to occupy due to uncorrected conditions that *materially affect* health or safety. Section (2) provides remedies to tenants for a landlord's *knowing* violation of section (1). Those remedies include termination of the tenancy and damages of either two months rent or twice the tenant's actual damages. If the violation is "unknowing," a tenant is left to other remedies not contained in ORS 90.380 except as stated in section (4). Section (3) provides remedies to a landlord and existing tenants after a governmental agency has "posted" a dwelling *during the tenancy* due to conditions that *materially affect* health or safety. Subsection (3)(a) allows a tenant to terminate if the conditions were not caused by the tenant, and, conversely, subsection (b) allows a landlord to terminate if the conditions were not caused by the landlord. Section (4) requires a landlord to return any security deposit and prepaid rent if the tenancy is terminated under section (1) or (3). Section (5) applies to conditions that pose an *imminent and serious threat* to the health or safety of occupants as distinguished from conditions that materially affect health or safety. Section (5) allows a tenant to terminate the tenancy within six months of its outset for those conditions expressed in section (4) as long as they were not caused by the tenant. That section also allows for damages of either two months rent or twice the tenant's actual damages if the landlord *knew or should have known* of the conditions. In addition, the tenant can recover under subsection (5)(a) and (b) any security deposit and prepaid rent. Section (6) establishes the requirements for the return of security deposits and prepaid rent, and section (7) authorizes a tenant to recover twice the

---

tenant at the landlord's customary place of business or by mailing the money by first class mail to the tenant. The money shall be returned within 14 days if the tenancy is terminated under subsection (2) or (3) of this section or within four days if the tenancy is terminated under subsection (5) of this section.

"(b) The tenant has the option of choosing the method for return of any money due under this section. If the tenant fails to choose one of these methods at the time of giving the notice of termination, the landlord shall use the mail method, addressed to the tenant's last-known address and mailed within the relevant period (four or 14 days) following the tenant's notice.

"(7) If the landlord fails to comply with subsection (6) of this section, the tenant may recover the money due in an amount equal to twice the amount due."

amount due if a landlord violates the requirements of section (6).

In context, the statute's overall focus is prohibitive in nature. It seeks to prevent the leasing of premises that are in violation of building code provisions. The "posting" requirement in section (1) is a requirement that the dwelling be determined by a governmental agency to be unlawful to occupy before the remedies of section (2) are triggered. The scientor element in section (2) that the landlord "know" of the violations only plays a role regarding the remedies that are available after the initial determination of a violation is made. Sections (2) and (5) operate to sanction a landlord who "knows" of the existence of the violations and rents or continues to rent the premise with that knowledge after such a determination. In context, the word "posted" can mean only that the city has made a determination that the code violations exist.[2]

The text and context of ORS 90.380 suggests little doubt about the legislature's intent to award tenants damages under the circumstances of this case without a notice being affixed to the dwelling. Even if doubt remains, the legislative history shows that the legislature's focus was on providing a disincentive for landlords who know that their buildings are unlawful to occupy to rent to new tenants and not to impose a predicate to the entitlement of damages. In 1983, Multnomah County Legal Aid Service requested and, apparently, provided the original language of HB 2554 that became *former* ORS 91.817(1) and (2), *renumbered as* ORS 90.380(1) and (2) (1989). Before HB 2554 reached the House Subcommittee on the Judiciary, tenant and landlord advocates had reached a compromise on a package of bills that included the amendments to HB 2554. Michael Marcus provided the bulk of the written and oral testimony before the Subcommittee and later before the Senate Judiciary Committee. He explained, in his written testimony to the Subcommittee that:

---

[2] Landlord refers us to ORS 90.750 in which the words "the posting" appear. The word "posting" in that context is used to help define the word "canvassing" in the context of members of a tenant association making contact with other tenants. It does not refer to governmental action and, therefore, is of no assistance in interpreting ORS 90.380(1).

"HB 2554 is designed to address a fairly common problem: a landlord removes a notice posted by a code enforcement agency prohibiting reoccupancy of a dwelling, and rents the dwelling unlawfully to an unsuspecting tenant. HB 2554 is *not* designed to benefit a tenant who was in possession prior to the posting, as that is a separate problem addressed by existing law.

"HB 2554 prohibits renting a dwelling unit which has been posted as unlawful to occupy until the conditions causing the posting are corrected. Subsection 2 imposes a statutory damage on a violator and makes the landlord liable for all security deposit and all prepaid rent.

"The proposed modifications submitted herewith are designed to accomplish two objectives: First, to limit the prohibition, and thus damage provisions, to situations in which the posting relates to code violations which materially affect health or safety. The purpose of this modification is to ensure that a tenant does not receive a windfall as a result of a posting relating to minor or frivolous code violations." Testimony, House Judiciary Subcommittee 2, HB 2554, April 21, 1983, Ex A (statement of Michael Marcus, Multnomah County Legal Aid Service) (emphasis in original).

In his oral testimony, Marcus said:

"HB 2554 is designed to address a problem which is fairly common in Portland and, I understand, other urban areas. It is designed to deal with a situation in which a rental unit becomes vacant and has been posted as unlawful to occupy by a code enforcement agency. Typically a red tag in Portland—other agencies use different forms—but the premises are quite prominently posted that unlawful to occupy because of code violations and against the code to reoccupy. It is very common, unfortunately, for owners of such buildings to remove the tag and to rent to new tenants. This bill is not designed to reach a tenant who is there at the time a problem arises [but] designed to reach illegal rerentals of buildings that have been posted." Tape recording, House Judiciary Subcommittee 2, HB 2554, April 21, 1983, Tapes 259, Side B, and 260, Side A (statement of Michael Marcus, Multnomah County Legal Aid Service).

There was little discussion in the Subcommittee on HB 2554, and none of the discussion focused on the "posting"

requirement of the bill. From the legislative record, it appears that no testimony was taken by the full House Committee on the Judiciary and that no reported discussion occurred, other than the mention that a representative from a landlord organization had appeared before the Subcommittee and had supported the bill. *See* Tape recording, House Committee on the Judiciary, HB 2554, May 2, 1983, Tape 283, Side A. The House Committee on the Judiciary sent the bill to the House with a "do pass" recommendation. The measure summary provided: "[HB 2554] imposes penalties and liability or [*sic*] landlord who knowingly rents premises when dwelling unit is posted by code enforcement agency as being unlawful to occupy because of conditions materially affecting health or safety." The analysis of the measure furnished to the house makes no mention of the problem of landlords removing notices.

When HB 2554 went to a vote on the house floor, Representative Smith explained:

"This bill simply prohibits a landlord from entering into a rental agreement with someone after a premises has been red tagged. Red tagging basically is what a local government might do to a unit because it falls down under code violations and frankly shouldn't be occupied. It expresses the penalties for what happens in that circumstance * * *." Tape recording, House Floor, HB 2554, May 12, 1983, Reel 12, Track 1 (statement of Representative Smith).

Then, before the Senate Judiciary Committee, Marcus explained in his written testimony:

"This bill is designed to respond to the scenario in which a landlord unlawfully removes a code enforcement notice prohibiting further occupancy because of code violations and rerents the apartment without curing those violations. The bill is only intended to address dwellings which become vacant and are then posted as unlawful to occupy. The code violations must 'materially affect health or safety' for the statute's sanctions to come into play. Those sanctions are that the landlord is liable for either two months' periodic rent or up to twice the actual damages, and must return all security deposit owed to the tenant and all prepaid rent if the tenant elects to terminate the tenancy. 'All reasonable moving expenses' was removed from the original bill

because that is included within 'actual damages' in the present form of the bill." Testimony, Senate Judiciary Committee, HB 2554, June 8, 1983, Ex E (statement of Michael Marcus, [Multnomah County] Legal Aid Service).

In his oral testimony before the senate committee, Marcus said:

"The purpose of the bill is to add an effective sanction for a landlord who would rerent an unlawful dwelling without curing the violation again only—two important qualifications, it only applies to a dwelling that has become vacant, it's not a sanction where a tenant who is there before its been posted can apply and the other is that the violations must materially affect healthy or safety * * *." Tape recording, Senate Judiciary Committee, HB 2554, June 8, 1983, Tape 193, Side B (statement of Michael Marcus, [Multnomah County] Legal Aid Service).

No reported discussion took place before the committee voted to send the bill to the floor with a "do pass" recommendation. The staff measure analysis discussed the "problem addressed" by the bill and the "function and purpose of the measure as reported out." Under "the problem addressed," the analysis explains: "Landlords who have had their building posted for violations of housing or building codes have been known to remove the notice and re-rent the premises. These tenants can then be forced to vacate by local authorities." The analysis furthers says,

"The bill prohibits a landlord from entering into a rental agreement with a new tenant while a dwelling is posted as unlawful for occupancy because of conditions which materially affect health or safety in violation of the building or housing code. It provides that a landlord who knowingly violates this prohibition is liable to a tenant who elects to or is forced to move from the tenant's security deposit and any prepaid rent. The tenant is also entitled to recover two months rent or twice actual damages, whichever is greater."

When the bill was submitted to the entire Senate, Senator Frye explained,

"Buildings that are in violation of building or safety codes are sometimes declared unlawful to occupy. Under the current law a tenant who unknowingly rents a posted

facility may be evicted by the authorities. HB 2554 prevents landlords from renting structures which may have been deemed unlawful to occupy. It provides for statutory damages if there is a knowing violation * * *. In a nutshell, if premises are posted as unsafe to occupy and a landlord knowingly goes ahead and rents those premises, he's going to be liable for the statutory penalties which HB 2554 contains." Tape recording, Senate Floor, HB 2554, June 15, 1983, Tape 134, Side B (statement of Senator Frye).

The bill passed both the Senate and the House without further reported discussion and became law.

In 1993, the same landlord/tenant advocates who had sponsored the 1983 legislation, proposed again a compromise bill, HB 2968. That bill included the language embodied in ORS 90.380(3). The staff measure summaries to the house and senate committees explained that that section of the bill:

"[p]rovides that a tenant may terminate a rental agreement immediately if a landlord rents an unsafe dwelling and requires the landlord to return any pre-paid rent and the security deposit after deducting any unpaid rent or damages. Tenant recourse depends on whether the landlord knowingly violated the law, who caused the damage, and at what point in the tenancy the building became unsafe." House Committee on Commerce, HB 2968, April 29, 1993 (bill file).[3]

The summary of the bill as presented by the landlord/tenant sponsors provides in its section-by-section explanation:

"As amended, this statute would cover three different situations.

"i. First, where a landlord rents a rental unit which the landlord knows to have previously been posted by a governmental agency as unlawful to occupy (a health or safety code violation or, in Portland, 'renting over a red tag'), the tenant may immediately terminate the tenancy, with actual notice (oral or written) stating the reason, and/or in

---

[3] *See also* House Committee on Commerce; Subcommittee on Business, HB 2968, April 12, 1993, Ex D (staff measure summary); House Committee on Commerce; Subcommittee on Business, HB 2968, April 20, 1993, Ex B (staff measure summary); Senate Judiciary Committee and Senate Committee on Business, Housing and Consumer Affairs (staff measure summaries in bill file).

any case recover damages, at the tenant's option. (In many cases, the tenant will not discover the unsafe posting until notified by the governmental agency, and that agency usually will force the tenant to vacate.)

"ii. Second, after the tenancy has begun, where a government agency posts a rental unit as unlawful to occupy due to a condition not caused by the tenant (such as when a wind storm rips off the roof), the tenant may immediately terminate with the same kind of notice, but with no damages." Testimony, Senate Judiciary Committee, HB 2968A, June 21, 1993, Ex C (statement of Kevin Hanway, Association of Oregon Housing Authorities).

John Van Landingham, representing the Lane County Legal Aid Service, explained to the Senate Judiciary Committee that of the three situations,

"The first occurs when a landlord does what in Portland is known as 'renting over a red tag.' A unit has already been determined to be unsafe for occupancy by a local governmental agency and that agency has posted it as unsafe for occupancy and the landlord removes the posting and rents it anyway. What the law would do is allow the tenant to terminate the tenancy immediately * * *." Tape recording, Senate Judiciary Committee, HB 2968, June 21, 1993, Tape 198, Side A (statement of John Van Landingham, Lane County Legal Aid Service).

As is evident from the legislative history, there is nothing in the language of ORS 90.380(1) that contemplates that, in the absence of a physical posting, there is no entitlement to damages under ORS 90.380(2). The emphasis of the legislature in the legislative history is on the rerenting of a dwelling that has been determined previously to be unlawful to occupy. Although the mention is made of Portland's "red tagging" and of landlords removing the red tags, the legislative history does not suggest that the legislature considered "red tagging" a prerequisite to landlord liability for damages. In fact, the absence of such a requirement in the language of the statute is significant in light of the legislative history. While the legislature knew that in Portland a red tag was usually affixed to the dwelling, the legislative history shows that this practice was referred to as an example, but not as a standard to be complied with on a statewide basis. The 1993

amendment summary acknowledges as much. The legislature could have said in ORS 90.380(1) that "a notice be posted on the dwelling" as it does in unrelated statutes. *See, e.g.*, ORS 624.085(3)(b) ("[p]ost a notice of closure upon the restaurant * * * in public view * * *."). However, it chose instead to use the phrase "posted a dwelling" in ORS 90.580(1). When the text and context of the statute is considered with its legislative history, I am persuaded that the intent of the legislature was to focus on the government's determination of the lawfulness to occupy rather on any procedural nicety of affixing a notice on the dwelling.[4]

In this case, the city inspector found the dwelling "to be in violation of the City Housing Maintenance Code," and the notice informed landlord that "the code violations must be corrected and approved *before* the building could be reoccupied." Landlord testified that he received the notice before he rented to tenants. Nonetheless, he entered into the rental agreement with tenants without remedying the violations. Therefore, the requirements of ORS 90.380 were met, and the trial court did not err in awarding damages under section (2).

In landlord's fourth assignment of error, he argues that the trial court erred in awarding tenants $1,400 in habitability damages when it said that there were only $700 in damages. Landlord asserts that the court made a mathematical error. Tenants argue that any error was not preserved for review on appeal because landlord had several opportunities

---

[1] The dissent's analysis and its criticism of reasoning flows from a single premise: the phrase in ORS 90.380(1), "[i]f a government has posted a dwelling as unlawful to occupy," has a common ordinary meaning within the text and context of the statute. The point of my departure from the dissent's reasoning is my disagreement with that proposition. As explained above, I believe that when the above phrase is read in context with the rest of ORS 90.380, the word "posted" does not have a clear, apparent meaning. Moreover, as is obvious in the other statutory uses of the verb "to post" referred to by the dissent, the legislature, when it wishes, knows how to require that a notice be affixed to a particular object or at what location the notice is to be published. In contrast to those statutes, ORS 90.380(1) does not say that a required notice must be placed in a particular location. Rather, the statute refers to the status of the subject dwelling as being "unlawful to occupy," or as if a declaration had occurred about its condition. Consequently, the phrase is reasonably susceptible to more than one meaning, and, accordingly, I have gone beyond the language of the statute in an effort to ascertain and carry out the legislature's intention.

to alert the trial court to his contention. At trial, the court said: "I found that this premises was in violation of the habitability statutes, and I am going to award $1400 on that basis * * *." At the hearing on landlord's motion for a new trial, the trial court gave the parties an opportunity to raise any objection to its damage calculations:

> "Just for my edification, because I have gone over these damages over and over[,] and I don't have good notes and I listened [to] the tape, I would like to get from each of you what your opinion of what the damages specifically are."

Landlord did not suggest on either occasion that the trial court had made a mathematical error in the calculation of damages, nor did landlord object when the trial court listed the final figures for damages and asked, "Does everybody agree with those?" I agree with tenants that, under the circumstances, landlord did not preserve his fourth assignment of error for appeal, and, therefore, I decline to consider it. ORAP 5.45.[5]

Armstrong, Linder, Wollheim, and Kistler, JJ., join in this concurrence.

**LANDAU, J.,** dissenting.

This case is about the rules of statutory construction and whether this court will follow them. At issue is the meaning of ORS 90.380(1), which uses the statutory term "posting" a dwelling that fails to meet health and safety standards. Usually, "posting" refers to nailing or otherwise affixing a notice to a wall or a post. That is, in fact, how the term is used elsewhere in the statute; indeed, it is how the term is used throughout the Oregon Revised Statutes. It is also how the term is used in relevant housing authority regulations and is, according to the legislative history, how the drafters of ORS 90.380(1) and those who enacted it used the term, as well.

The concurrence nevertheless concludes that the term refers merely to a housing authority "determination" that a dwelling fails to meet health and safety standards, regardless of whether the housing authority tells anyone

---

[5] Because of my disposition, I do not reach tenants' cross-assignment of error.

about that determination. On its face, the concurrence's reading of the statute is contrary to the ordinary meaning of its terms. In fact, its interpretation of the term "posting," so far as I can tell, is entirely unprecedented. In arriving at its novel reading of the statute, the concurrence cites several rules of statutory construction, but then ignores each of them. Instead, it ascribes to the legislature a broad purpose and then forces the language to meet that purpose. Such analysis cannot be reconciled with any of the rules of statutory construction. I therefore dissent.

I begin with how the statute should have been interpreted in this case and then turn to a critical analysis of the concurrence's interpretation. ORS 90.380(1) provides:

> "If a governmental agency has posted a dwelling as unlawful to occupy due to the existence of conditions that violate state or local law and materially affect health or safety, a landlord shall not enter into a rental agreement for the dwelling unit until the conditions leading to the posting are corrected."

The statute thus prohibits landlords from renting premises that have been "posted" as unlawful to occupy. The question is what "posted" means.

The analytical process for arriving at an answer is well-known. We are to begin with the ordinary meaning of the disputed term. *See, e.g., Smurfit Newsprint Corp. v. Dept. of Rev.*, 329 Or 591, 597, 997 P2d 185 (2000) ("At the first level of analysis, we examine the text and context, giving words of common usage their plain, natural, and ordinary meaning."); *State v. Higgins*, 165 Or App 442, 445, 998 P2d 222 (2000) ("[w]ords of common usage should be given their 'plain, natural and ordinary meaning' "); *State v. Perry*, 165 Or App 342, 347, 996 P2d 995 (2000) ("The words of a statute are given their plain, natural and ordinary meaning."); *Young v. State of Oregon*, 161 Or App 32, 36, 983 P2d 1044, *rev den* 329 Or 447 (1999) ("[B]ecause the term 'labor' is not modified, is not defined anywhere in the statute or related statutes, and is a word of common usage, we must ascribe to it, its plain, natural and ordinary meaning.").

The rule is frequently stated in terms of a presumption, that we are bound to give a statutory term its ordinary

meaning unless there is *clear evidence* that the legislature intended some other meaning. *See, e.g., Wyatt v. Body Imaging, P.C.*, 163 Or App 526, 533, 989 P2d 36 (1999), *rev den* 330 Or 252 (2000) ("we begin with [statutory text], giving the textual terms their ordinary meanings, unless the statutes or their contexts make clear that a different meaning was intended"); *Welliver Welding Works v. Farmen*, 133 Or App 203, 208, 890 P2d 429 (1995) ("We are generally constrained to assume that the legislature intended the words of a statute to be given their common, ordinary meaning unless there is a clear indication that some other meaning was intended."); *SAIF v. Meredith*, 104 Or App 570, 574, 802 P2d 95 (1990) ("in the absence of a clear legislative intent to the contrary, the court is bound to give to the words of a statute their natural and ordinary meaning").

If the language of the statute gives no clear answer one way or the other—that is, if the language is reasonably capable of more than one construction—we are permitted to examine legislative history for extrinsic evidence of which among the reasonable possibilities the legislature intended. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).

Whether or not a term is given its plain, ordinary meaning, we always are constrained by the reasonable construction of the language that the legislature actually enacted. *See, e.g., Dean Warren Plumbing v. Brenner*, 150 Or App 422, 428, 946 P2d 356 (1997), *rev dismissed* 327 Or 174 (1998) (" 'we are constrained by the reasonable construction of the language that the legislature actually enacted' ") (quoting *Deluxe Cabinet Works v. Messmer*, 140 Or App 548, 553, 915 P2d 1053 (1996)); *Tee v. Albertson's, Inc.*, 148 Or App 384, 389, 939 P2d 668 (1997), *rev den* 326 Or 465 (1998) (same); *Fernandez v. Board of Parole*, 137 Or App 247, 252, 904 P2d 1071 (1995) (same). In other words, even if a term is not given its plain, ordinary meaning, there are limits to what we can say that a statute means, regardless of what the legislature intended.

This is not a rule of mechanical literalism. No word is so crystal clear as to avoid some fuzziness around the edges

in some contexts. But there are—indeed, there must be— limits. In consequence, the courts have held that when the legislature uses language that cannot reasonably be construed to accomplish a particular purpose, we are without authority to go beyond the boundaries of the reasonable construction of the language actually enacted. *See, e.g., Young*, 161 Or App at 39 (declining to read statute to exempt white collar workers from overtime law because "there is no principled way" to read the existing statutory language to say that); *Messmer*, 140 Or App at 554 (declining to read statute to change existing law because "the language of the statute cannot reasonably be read" to do that).

Those limits are generally determined by reference to dictionaries, which frequently list wide ranges of definitional possibilities. *See, e.g., State v. Holloway*, 138 Or App 260, 265, 908 P2d 324 (1995) (dictionaries "suggest what the legislature *could have* meant by the terms it enacted") (emphasis in original). The way the term is used in context, along with other relevant evidence of legislative intent, establishes which among the reasonable possibilities reflected in the dictionary is the correct one. *See, e.g., Steele v. Employment Department*, 143 Or App 105, 113, 923 P2d 1252 (1996), *aff'd* 328 Or 292 (1999) ("[t]he subject and purpose of the statute, together with the statutory language that surrounds the word in question, narrow the array of definitional choices that dictionaries alone afford").

Thus, according to settled rules of statutory construction, the proper method of analysis is as follows. First, ascertain the range of possible meanings of the term "post" or "posting." Second, examine the context to determine whether, from among the definitional possibilities, the legislature clearly intended one other than the plain, ordinary meaning. Third, if examination of the text in context does not reveal the answer, examine the legislative history and, if necessary, other aids to construction. The ordinary meaning of the term *must* be applied unless there is clear evidence that the legislature intended one of the other definitions. In all events, the interpretive choices are limited by the reasonable construction of the language actually enacted.

I hasten to emphasize that what I have described are well-settled rules of construction; I did not make them up. They are not necessarily the rules of interpretation that I would propose were we writing on a clean slate. But we are not writing on a clean slate.

In this case, the verb "to post" is defined as follows:

> "**1:** to affix (as a paper or bill) to a post, wall, or other usual place for public notices: PLACARD ‹the notice on the bulletin board› ‹signs are *-ed* throughout the state› **2a:** to publish, announce, or advertize by or as if by the use of a placard ‹the students' grades are *-ed*› ‹the yardmaster... *-s* the track number —*Monsanto Mag.*› ‹the *-ed* price for ... crude oil —*N.Y. Times*› **b:** to denounce (as a person or institution) by public notice ‹-*ed* the theater as unfair —Upton Sinclair› ‹harry and - a man for his losings —Rudyard Kipling› **c:** to enter (a name) on a public listing ‹nurses *-ed* for night duty› ‹-*ed* missing in the flood —John Blight› **d:** to forbid (property) to trespassers under penalty of legal prosecution by notices placed along the boundaries ‹- a brook› ‹wandering around *-ed* property —Ronald Sercombe› * * *."

*Webster's Third New Int'l Dictionary*, 1771 (unabridged ed 1993). *Black's Law Dictionary* similarly defines the term to mean:

> "To bring to the notice or attention of the public by affixing to a post or wall, or putting up in some public place; to announce, publish or advertise as by use of [a] placard."

*Black's Law Dictionary*, 1049 (5th ed 1979).

There can be no debating that the plain, natural, and ordinary meaning of "to post" is the first one, that is, to nail a piece of paper to a post, wall, or similar place of public notice. The question is whether there is any indication in the text or context of the statute that the legislature clearly intended that the term "posting" in ORS 90.380(1) mean something other than what it usually means.

I begin with the section in which the term is used. It provides that,

> "[i]f a governmental agency has posted a dwelling as unlawful to occupy due to the existence of conditions that violate state or local law and materially affect health or

safety, a landlord shall not enter into a rental agreement for the dwelling unit until the conditions leading to the posting are corrected."

ORS 90.380(1). Certainly, the sentence makes perfect sense if the plain, natural, and ordinary definition of the term "post" is applied. If a government has affixed a notice of unhabitability to a dwelling, the landlord may not rent it out until the conditions have been corrected.

I turn next to the balance of the landlord-tenant statute. ORS 90.750, which describes the rights of tenants to engage in "canvassing" other tenants in a facility, provides, in part:

"As used in this subsection, 'canvassing' includes door-to-door contact, an oral or written request, the distribution, the circulation, *the posting* or the publication of a notice or newsletter or a general announcement or any other matter relevant to the membership of a tenants' association."

ORS 90.750(3) (emphasis added). Clearly, "posting" is used in its ordinary sense in that statute. Strictly speaking, of course, ORS 90.750(3) is not "context" for the enactment of ORS 90.380(1), as it was not enacted until several years later. *Stull v. Hoke*, 326 Or 72, 79-80, 948 P2d 722 (1997). But it is still relevant to understanding how the legislature uses the term. *See City of Eugene v. Nalven*, 152 Or App 720, 725-26, 955 P2d 263, *rev den* 327 Or 431 (1998) ("We consider other statutes *in pari materia*, if not strictly speaking as 'context' of the statute—because the other statutes were later enacted—then certainly because of our obligation to give full meaning and effect to all relevant statutory provisions.") (citation omitted). Indeed, the Supreme Court has held that we are to presume that "use of the same term throughout a statute indicates that the term has the same meaning throughout the statute." *PGE*, 317 Or at 611; *see also Racing Com. v. Multnomah Kennel Club*, 242 Or 572, 584, 411 P2d 63 (1966) ("the presumption is that the word was used to express the same meaning in both sections").

I also note the broader context, that is, the manner in which the legislature uses the same term in other statutes. My research of the Oregon Revised Statutes reveals that the

legislature consistently uses the term "post" to refer to publicly displaying a physical notice. ORS 624.085(3)(b), for example, provides that, if the Assistant Director for Health determines that closure of a restaurant or bed and breakfast facility is necessary to protect public health, the assistant director must "[p]ost a notice of closure upon the restaurant or bed and breakfast facility * * * in public view * * *." There can be no question that "post" means what it usually means, that is, affixing a notice in a public place. Similarly, in ORS 3.311(2), the clerk of a trial court is required to "post a notice of the time and place of the trial in a conspicuous place * * *." Likewise, in ORS 36.420(1), the clerk is required to "post a notice of the time and place" of an arbitration hearing "in a conspicuous place." In ORS 87.045(2), a contractor is required to "post and record a completion notice," and that posting must occur "in some conspicuous place upon the land or upon the improvement situated thereon." ORS 87.045(3). In each case, the term is used in the same sense: affixing a notice where it can be seen by the public. *See also* ORS 194.162(4) (notaries must "post the notice" that he or she is not licensed to practice law "in a conspicuous place in the notary's place of business"); ORS 203.079(1)(a) (authorities may not remove homeless persons from established camping site until they "post a notice"); ORS 279.350(4) (contractors and subcontractors engaged in public works contracts must "keep the prevailing wage rates posted in a conspicuous and accessible place"); ORS 342.700 (a school district's sexual harassment policy "shall be posted" on a sign in all grade 6 through 12 schools); ORS 441.067(2) (owner of licensed long-term care facility "shall post" recent inspection reports, procedures for filing complaints); ORS 443.755(3)(b) (owner of licensed adult foster homes "shall post the inspection report in the entry or equally prominent place"); ORS 459.426(1) (any person selling new lead-acid batteries "shall post in each area where lead-acid batteries are sold a clearly visible and legible sign" regarding proper disposal).[1]

---

[1] I do not list all the references that use the term "post" in this way. There are 93 of them. So far as I can tell, the Oregon Revised Statutes use the term "post" in only two other ways: first, in an accounting sense, as in "posting" a bookkeeping entry, *see, e.g.,* ORS 311.370(3) ("the tax collector shall post the payments evidenced by the receipts * * *"); and second, in the sense of offering payment, as in "posting" a bond, *see, e.g.,* ORS 87.076(4)(a) ("[a]ny person entitled to post a bond

I also review the regulatory context in which the statute was enacted. *See Fisher Broadcasting, Inc. v. Dept. of Rev.*, 321 Or 341, 898 P2d 1333 (1995) (examining existing tax regulations as context for enactment of uniform tax act). ORS 90.380(1) was enacted in 1983. Or Laws 1983, ch 356.[2] The contemporaneous City of Portland housing regulations, for example, drew a clear distinction between merely determining that a building is unsafe and "posting" it as such. Indeed, the regulations drew a distinction between merely providing notice and "posting" it:

> "If * * * [a] building official finds [a building] to contain one or more substandard conditions, as defined in this title, he shall, in writing, notify the owner * * * of the substandard conditions.
>
> "* * * * *
>
> "Should the building official find the existence of one or more substandard conditions to the extent that an immediate danger is posed to the health, safety or property of the occupants, the owner, or the general public, he may order the residential property to be vacated forthwith. *If the building official orders the property vacated, he shall post a copy of the order to vacate on or near the main entrance to the main building* and serve such order on the owner or his agent."

City of Portland Housing Ordinance § 29.04.050 (adopted September 29, 1979) (emphasis added). Thus, under the local housing regulations, a notice was "posted" only if the substandard condition was dangerous enough to require immediate vacating of the premises. And "posting" plainly refers to affixing a physical notice "on or near the main entrance" of the premises.[3]

---

* * *"). I have found no statute that uses the term "post" or "posted" in the sense of "make or made a determination."

[2] Actually, both subsections (1) and (2) were enacted in 1983. A third subsection was added in 1987, and four additional subsections were added in 1993.

[3] The current Portland City Code retains the distinction between merely notifying a landlord of substandard conditions and "posting" the premises as such. Portland City Code § 8.20.200.

Other municipal codes likewise draw a distinction between serving a notice on the landlord and "posting" the premises by affixing a notice on a post, door, or wall. *See, e.g.,* Eugene City Code § 6.080 (if city manager finds that a nuisance exists, he or she "shall cause a notice to be posted on the premises or at the site of the

In light of the foregoing, it is difficult for me to understand how it can be contended that there is clear evidence that the legislature intended something other than the plain, natural, and ordinary meaning of the term "posting" to apply to ORS 90.380(1). To the contrary, *all* of the usual "first level" evidence of legislative intent clearly indicates that the legislature intended the term to mean what it usually means: The way the term is used in ORS 90.380(1) itself, the way the legislature uses it in the balance of the landlord-tenant statute, the way the legislature uses the term in *every* other statute, and the way that the term is used in the relevant regulatory context all point to the unremarkable proposition that the statute simply means what it says.

Because the text of the statute, properly considered in its context, admits of only one reasonable interpretation, I would end my analysis of ORS 90.380(1) at this point. But, because the concurrence ventures into the legislative history, I do so also; it only makes the legislature's intentions clearer yet. ORS 90.380(1) was enacted by the 1983 Legislative Assembly. Apparently, it was drafted by Michael Marcus, then the Director of Multnomah County Legal Aid, and introduced as House Bill 2554. Before the House Judiciary Committee, Marcus offered written testimony that explained the purpose of the bill:

> "HB 2554 is designed to address a fairly common problem: a landlord *removes a notice posted by a code enforcement agency* prohibiting reoccupancy of a dwelling and rents the dwelling unlawfully to an unsuspecting tenant."

Written Testimony, House Judiciary Committee, HB 2554, April 21, 1983, Ex A (statement of Michael Marcus) (emphasis added). In his oral testimony to the committee, Marcus likewise explained:

> "HB 2554 is designed to address a problem which is fairly common in Portland and, I understand, other urban areas. It is designed to deal with a situation in which a

---

nuisance" and "shall cause a copy of the notice to be personally served" on the owner); Salem City Code § 56.290 (if a building is determined to be in violation of building code, a notice "shall be served on the record owner and posted on the property").

rental unit becomes vacant and has been posted as unlawful to occupy by a code enforcement agency. *Typically a red tag in Portland—other agencies use different forms—but the premises are quite prominently posted as unlawful to occupy* because of code violations and against the code to reoccupy. It is very common, unfortunately, for owners of such buildings to remove the tag and to rent to new tenants. This bill is not designed to reach a tenant who is there at the time a problem arises [but] designed to reach illegal rerentals of buildings that have been posted."

Tape recording, House Judiciary Subcommittee 2, HB 2554, April 21, 1983, Tapes 259, Side B, and 260, Side A (statement of Michael Marcus). Marcus's use of the term "posting" hardly could be clearer. It refers to a physical notice affixed to a public place. Indeed, it is typically a "red tag" in Portland and a different form in other cities.

The same understanding is reflected in the House floor debate. Representative Smith, for example, explained:

"This bill simply prohibits a landlord from entering into a rental agreement with someone after a premises has been red tagged. Red tagging basically is what a local government might do to a unit because it falls down under code violations and frankly shouldn't be occupied."

Tape recording, House Floor, HB 2554, May 12, 1983, Reel 12, Track 1 (statement of Representative Smith). Once again, the reference to "red tagging," which, as Marcus explained, meant posting the premises with a written notice. Marcus gave the same explanation to the Senate Judiciary Committee:

"This bill is designed to respond to the scenario in which a landlord *unlawfully removes a code enforcement notice prohibiting further occupancy* because of code violations and rerents the apartment without curing those violations. The bill is only intended to address dwellings which become vacant and are then posted as unlawful to occupy."

Written testimony, Senate Judiciary Committee, HB 2554, June 8, 1983, Ex E (statement of Michael Marcus) (emphasis added). Again, the meaning of "posted" is clear. It refers, as it usually does, to the affixing of a physical notice where it can be seen by the public. The Senate Staff Measure Summary

repeats the explanation that Marcus provided: The problem the bill seeks to address is that "[l]andlords who have had their buildings posted for violations of housing or building codes have been known to *remove the notice* and rerent the premises." (Emphasis added.)

Particularly in light of the regulatory context that I have mentioned, the references to "posting" and "removing the notice" seem quite clear. Recall that the Portland City Code that was in effect at the time the legislature considered HB 2554 drew a distinction between merely determining that a violation existed and "posting" premises as uninhabitable by affixing a notice on a wall or door. Taking such regulations into account, the concerns that Marcus identified about landlords removing a posted notice cannot be mistaken. Those concerns had to do with the removal of a physical posting affixed to a public place. There is absolutely no evidence in the legislative history that any witness, staff person, or legislator used the term "posting" in any sense other than its ordinary sense.

To summarize, then: The plain, natural, and ordinary meaning of the term "posting" refers to affixing a physical notice to a post, wall, or the like. That meaning is perfectly consistent with the phrasing of ORS 90.380(1). It is likewise consistent with the use of the term in other provisions of the statute, with the use of the term in other statutes, and with the use of the term in applicable regulations known to the legislature at the time of enactment. Moreover, the author of the bill that ultimately became ORS 90.380(1) explained quite clearly that "posting" a dwelling is synonymous with "red tagging" it, that is, affixing a red piece of paper (or a different form in some cities) to the door or wall of the dwelling. And legislators adopted that phrasing in their own discussions of the bill. Those are all sources of legislative intent that the rules of statutory construction require us to examine in determining the meaning of a disputed enactment. Every single one of them points to the same conclusion, namely, that the term "posting" means what it ordinarily means.

But the concurrence concludes otherwise, and it is to the rationale for that conclusion that I now turn. According to

the concurrence, to "post" a building as uninhabitable means merely to "determine" that it is uninhabitable. In arriving at that conclusion, the concurrence begins well enough, correctly identifying the objective of statutory construction as ascertaining the intended meaning of the statute and correctly noting that our first obligation is to examine the text of the statute in context. It even cites—although somewhat selectively[4]—portions of several dictionary definitions of the term "to post." 168 Or App at 208. The problem is, having cited the foregoing rules of statutory construction, the concurrence promptly ignores all of them.

Consider, for example, how the concurrence refers to the ordinary meaning of the term. It acknowledges that "[t]he verb 'posted' in section (1) could be understood to refer to a notice affixed to a wall, such as to post a public notice." 168 Or App at 208. But it never applies the rule that that definition *must* apply in the absence of *clear* evidence that the legislature intended otherwise. The closest the concurrence comes to explaining why it declines to apply the ordinary meaning of the term is to suggest that, when the legislature enacted an enhanced penalty for a landlord's "knowing" violation of the statute, it implicitly suggested that the statute could be violated unknowingly, which, in turn, implicitly suggests that the term "posting" has nothing to do with notice, which, in turn, implicitly suggests that "posting" does not have to mean what it usually means. 168 Or App at 211.

To begin with, it is difficult for me to understand how stacking such inferences satisfies the clear statement rule that ordinarily applies. *E.g., Meredith*, 104 Or App at 574 ("in the absence of a *clear legislative intent* to the contrary, the court is bound to give to the words of a statute their natural and ordinary meaning") (emphasis added). But aside from that, the concurrence's reasoning is not logical. It simply does not necessarily follow that, because the statute imposes an enhanced penalty for knowing violations, the term "posting" cannot mean what it usually means.

---

[1] The concurrence, for example, cites *Webster's Third New Int'l Dictionary*, 1771 (unabridged ed 1993), as defining "to post" to mean " 'denounced' or to invoke censure." 168 Or App at 208. It avoids quoting the complete text of even that definition, which includes the qualifying phrase *"by public notice."* (Emphasis added.)

The fact is that the statute works perfectly well by giving its terms their ordinary meanings. A building may be posted by the ordinary means, and a landlord may rent it out either knowingly or unknowingly. If the building has been red tagged and the landlord knowingly rents it out nevertheless, then the landlord will be subject to the enhanced penalties that the statute provides. If the building has been red tagged and the landlord is not yet aware of that fact, then the enhanced penalties do not apply. That only makes sense. The purpose of "posting," afterall, is to provide notice to *the public*, not the landlord.

Consider further that the concurrence, having cited the range of definitional possibilities, ultimately adopts *none* of them, opting instead for a definition of the term "posting" that is utterly original. In the process, it abandons the rule that there are limits to what courts can make statutory words to mean, that we are constrained by the reasonable definitions of the words actually enacted. *E.g., Fernandez*, 137 Or App at 252 ("we are constrained by the reasonable construction of language that the legislature actually enacted").

Consider also the concurrence's use of the legislative history. To begin with, it ignores the rule that it is not appropriate to resort to legislative history in the absence of an ambiguity. *PGE*, 317 Or at 611 (legislative history may be examined "[i]f, but only if" there is ambiguity). Nothing in its opinion even purports to address, much less actually establish, the existence of more than one reasonable construction of the statutory language. *Koitzsch v. Liberty Northwest Ins. Corp.*, 125 Or App 666, 669, 866 P2d 514 (1994) (a statute is ambiguous if "it is capable of more than one reasonable interpretation").

Even more perplexing is the concurrence's reading of the legislative history itself. I am no fan of resorting to legislative history. But in my years on the bench, I have seen few, if any, cases in which it speaks more clearly to the point. Marcus explicitly defined "posting" in terms of its ordinary meaning, indeed, referring to it as "red tagging" by posting a paper on a door or wall. The concurrence ignores that, exhibiting what the late Judge Harold Leventhal quipped is the practice of treating legislative history as if "entering a

crowded cocktail party and looking over the heads of the guests for one's friends."[5]

The concurrence also refers to the legislative history of certain amendments to the statute in 1993, some ten years after ORS 30.980(1) was enacted. In so doing, it fails to heed the well-established rule that "[s]ubsequent statements by legislators are not probative of the intent of statutes already in effect." *United Telephone Employees PAC v. Secretary of State*, 138 Or App 135, 139, 906 P2d 306 (1995). In any event, the legislative history that the concurrence cites reflects the same use of the term "posting" that Marcus did in explaining the original bill to the 1983 legislature, that is, posting by affixing a physical notice to a door, wall, or post. The summary prepared by the sponsors of the 1993 amendments explained that, as amended, the statute would address situations in which:

> "[A] landlord rents a rental unit which the landlord knows to have previously been posted by a governmental agency as unlawful to occupy (a health or safety code violation or, in Portland, *'renting over a red tag'*)."

Testimony, Senate Judiciary Committee, HB 2968A, June 21, 1993, Ex C (statement of Kevin Hanway, Association of Oregon Housing Authorities) (emphasis added). Similarly, a representative of the Lane County Legal Aid Service explained that the amended statute would cover situations in which:

> "[A] landlord does what in Portland is known as 'renting over a red tag.' A unit has already been determined to be unsafe for occupancy by a local government agency and that agency has posted it as unsafe for occupancy *and the landlord removes the posting and rents it anyway*."

---

[5] The concurrence's selective reading of the legislative history also is inconsistent with its own conclusion about the meaning of the statute. At one point, it declares that the legislative history demonstrates "that the legislature's focus was on providing a disincentive for landlords who know that their buildings are unlawful to occupy to rent to new tenants." 168 Or App at 211. Yet at another point, it declares that whether the landlord knows that the buildings are unlawful to occupy is irrelevant to a violation of ORS 90.380(1) and is only relevant in determining penalties under ORS 90.380(2). 168 Or App at 208-11.

Tape recording, Senate Judiciary Committee, HB 2968, June 21, 1993, Tape 198, Side A (statement of John Van Landingham, Lane County Legal Aid Service) (emphasis added). There can be no debate that the witness used the term "posting" in its ordinary sense.

The concurrence's only response is to observe that the statute makes no mention of "red tagging" and to assert that is merely an example of a practice, not a statutory prerequisite. 168 Or App at 216-17. Whether the statute mentions "red tagging," however, it does require "posting." The question is what *that* term means. The ordinary meaning of the term, its use in statutory and regulatory context, and its explicit definition in the legislative history all demonstrate that it means physically affixing a notice to a door, wall, or the like. In Portland, that is accomplished by affixing a red sheet. No one suggests that the statute requires affixing a notice of any particular color. But the fact remains that the term was understood to apply to some sort of physical notice affixed to the premises.

Recall, for example, the statements contained in the legislative history that the concurrence itself relies on. The witness from Lane County Legal Aid Service explained that the statute applies when the local housing authority "has posted [the dwelling] as unsafe for occupancy and the landlord removes the posting and rents it anyway." The witness certainly did not use the term "posting" in the way that the concurrence suggests. If he had, his testimony would make no sense. It would refer to situations in which the local housing authority "has [determined] it as unsafe for occupancy and the landlord removes the [determination] and rents it anyway." If the determination was not physically affixed to the premises, how could the landlord remove it?

In the end, the concurrence resorts to declaring, *ipse dixit,* that the legislature intended broadly to prohibit renting out premises that have been determined to be uninhabitable and that affixing a public notice to that effect amounts to a mere "procedural nicety." 168 Or App at 217. In the first place, as I have noted, the language and the legislative history show—repeatedly, in the case of the legislative history—

that the legislature's focus was considerably more narrow. But aside from that, the concurrence's analytic approach is backwards. Under current interpretive rules, the proper focus is not to divine some broad purpose and then force the statutory language to meet that purpose. As the Supreme Court explained in *State v. Vasquez-Rubio*, 323 Or 275, 280, 917 P2d 494 (1996), the text must be consulted first, and any attribution of purpose must be fairly embraced by that text:

> "To interpret a statute properly, this court must focus on the exact wording of the statute. Indeed, it is the text—or 'the exact wording of the statute'—that provides the best evidence of the legislature's intent."

In this case, the exact wording of the statute is that a landlord is liable under ORS 90.380(1) only if the premises have been "posted" as uninhabitable. Applying the relevant rules of construction compels the conclusion that the term "posted" carries its plain, normal, ordinary meaning. Nothing in the text of the statute or its context or its enactment history demonstrates that the legislature *clearly* intended any other definition to apply, much less the entirely original one that the concurrence adopts.

I respectfully dissent.

Deits, C. J., and De Muniz, Haselton, and Brewer, JJ., join in this dissent.