[Civ. No. 17651.   Second Dist., Div. Three.   Dec. 19, 1950.]

HERBERT J. MATTSON, Appellant, v. HOLLYWOOD TURF CLUB (a Corporation), Respondent.

216

Guthrie, Darling & Shattuck for Appellant.

Freston & Files for Respondent.

SHINN, P. J.—Plaintiff, an industrialist sojourning from Louisville, purchased 30 $100 pari-mutuel show tickets on a horse running at Hollywood Park, a race course operated by defendant. The horse won, and shortly thereafter the tickets were stolen from plaintiff's pocket. Twenty of them were presented by the thief, or an accomplice, to a cashier, and were cashed; the remaining 10 were not cashed. The track eventually paid plaintiff the winnings on the 10 tickets that were not cashed upon satisfactory proof made to the California Horse Racing Board, pursuant to section 19598, Business and Professions Code, but refused to pay him for the 20 that had been cashed. Plaintiff sued for the value of these tickets amounting to $4,700, and appeals from an adverse judgment.

The court made several findings adverse to plaintiff, namely: That the tickets were cashed before defendant was notified of the theft, that defendant was not guilty of negligence, and that plaintiff was guilty of contributory negligence. These findings are challenged as without support in the evidence.

The *modus operandi* of defendant upon the occasion in question was the following: The race was a photo finish between the first and second horses; within a minute after the

horses passed the wire the picture of the finish was sent to the judges by the official photographer, showing that plaintiff's horse had won by a head, and the numbers of the winning horses were promptly posted on the board. While the picture was being prepared the horses were returning to the post and the jockeys were being weighed in. When this had been accomplished the race was declared official, and was so announced. The photo finish did not delay the computation of the pay-off for win, place and show, which was computed for both win and place for the first two horses, without waiting for announcement of the winner. Messengers carried pay-off slips to the cashiers at five or six $100 cashiers' windows and upon the flashing of a pay-off light the cashing of tickets began immediately. All this took place in a remarkably short space of time. The holder of the 20 tickets was standing at one of the cashier's windows when the pay-off slips arrived and his tickets were cashed at once. This individual was not identified except as an unnamed "motion picture extra." Plaintiff's activities after the race were the following: He took his show tickets, which were encircled with a rubber band, and 20 win tickets on the same horse from his left trousers pocket and placed them in an outside breast pocket of his coat. He had kept a hand upon his trousers pocket, in which he also had some $20,000 in currency, and after the tickets were transferred he kept a hand upon his coat pocket. While thus guarding against the loss of his property he was accosted by a tout with whom he had a slight acquaintance and who had given him a tip on the winning horse. This character expected to be paid for the tip and insisted upon accompanying plaintiff to the cashier's window. Plaintiff did not relish this suggestion, but promised to "take care of" the tout. The latter, however, was persistent, and plaintiff left his pocket unguarded long enough to shove his annoyer away. Immediately thereafter he discovered that his show tickets were missing. He then went to the sellers' windows where he had purchased his tickets, and where he was known by name. He reported his loss, and a clerk reported it to defendant's Security Police. Plaintiff was then taken by one of the selling clerks to the information window where he made out a claim for the value of the 30 tickets. Security Police came upon the scene and took plaintiff to the office of their superintendent where he was shown a number of photographs. He identified one picture as that of the tout, and was told that this individual

had a long criminal record. The police officers testified that plaintiff did not wish to have the tout prosecuted, since he believed his loss was covered by insurance. Plaintiff testified that the officers were disinclined to arrest the tout for the reason they were using him as a "stool pigeon." This was denied by the officers. At any rate the tout was not arrested, although the officers contacted him and received from him a description of a man to watch for at the cashiers' windows. The evidence with relation to this incident was indefinite and incomplete. However, defendant's credulous police stationed themselves at the cashiers' windows waiting for the accomplice to walk into their trap. Needless to say, the latter, somewhat more astute, had not waited for all these activities to take place, and was not apprehended. Plaintiff testified that the selling clerks told him payment on the tickets would be stopped. The clerks denied this. Plaintiff also testified that, although he was not known by name to the cashiers, he went to one of their windows and notified a clerk of his loss. There was evidence to the contrary. The distance to be travelled between the particular sellers' windows and the window where the tickets were cashed was estimated by witnesses at about 240 yards, or a city block. There was no intercommunication between the sellers' and the cashiers' windows. The several cashiers were not notified of the theft. The police were merely hoping to arrest the person who had possession of the tickets. It is not the practice of defendant, when possession of a ticket has been reported as lost to stop payment upon all tickets of the same class.

We shall discuss first the finding that the theft of plaintiff's tickets was due to his own negligence "in carrying them (tickets) in an unnecessarily exposed and insecure position in an outside breast pocket of his coat and he was in a crowded public place among people whom he did not know." This finding is clearly without support in the evidence. Plaintiff exercised great care to protect his property from loss. He know the methods of touts, and that he was dealing with one, but he did not know the fellow had a criminal record. Defendant's police knew all about him and that it was unsafe to have him on the premises. We cannot see any reason for shifting part of the blame to plaintiff. Surely the exercise of due care does not require patrons of defendant's track to carry their valuables in money belts, or otherwise conduct themselves as if all strangers were pickpockets. If, in view of the evidence, plaintiff was guilty of contributory negligence,

it would mean that defendant may, with impunity, allow persons of immoral character to mingle with its other patrons.

■ We conclude from the evidence related that it was sufficient to sustain the finding that the tickets were cashed before defendant was notified of plaintiff's loss. The same evidence supports the finding that defendant was not guilty of negligence. It was alleged that defendant was negligent in that defendant did not "require each person who presented to defendant a $100.00 show ticket or tickets on horse No. 1 Race No. 4 held July 12, 1947, at Hollywood Park for payment to prove that he was the owner of such pari-mutuel ticket or tickets before paying out on such tickets" etc. It was also alleged in the same cause of action that defendant had been notified of the theft of the tickets before any tickets were cashed. We do not understand plaintiff to claim that defendant was negligent if the tickets were cashed without notice that they had been stolen. The finding on that issue therefore disposes of this claim of negligence.

■ Finally, plaintiff relies upon the doctrine of *caveat emptor*. He cites the case of *Crocker Nat. Bank* v. *Byrne & McDonnell*, 178 Cal. 329 [173 P. 752], where the owner of nonnegotiable bonds was allowed to recover their value from defendants to whom they had been pledged by a thief, and other cases to the same effect. He says that his pari-mutuel tickets were property, and that defendant could not acquire title thereto from a thief. This contention requires examination of the main features of the transaction in which the parties were engaged. The pari-mutuel system of betting on horse races was described in the evidence, it is quite generally understood in California, and our references to it will be of a general nature. Whether it is a game of skill, as some believe, or of chance, as many have learned, it provides a legal method for getting rid of one's money. A licensed track sells tickets and acts as custodian of the funds, which are accumulated in pools for win, place and show; the track takes the share of its partner, the state, and its own share, from the top, and divides what is left in the several pools among the holders of winning tickets. The tickets in a given pool in a given race are identical as to form. A holder who has lost his ticket has no means of identifying it. Possession is his only evidence of ownership. It is also the only evidence upon which the track makes distribution. Therefore, as we have said, if a ticket should be reported as lost or stolen defendant has no practice of requiring each holder of a ticket

of the same type to prove that he came by it honestly, before paying him the amount his ticket represents, although it may be inferred that defendant would withhold payment on a ticket in the hands of a known or suspected thief. Such are the terms offered to the betting public, and they constitute the essential features of the implied contract between the track and its bettors. One who gambles must do so in accordance with the rules of the game. Plaintiff, who was no novice at the tracks, was not unfamiliar with the system. Neither was he unaware of the fact that there are ways of losing money at race tracks without betting on the horses. He took good care of his money and tickets except for one fatal, and it would seem, unavoidable mistake.

The rule with relation to stolen property does not apply to plaintiff's situation. Defendant did not purchase the tickets, nor acquire any interest in them. It already had plaintiff's money, and would gain nothing by cashing them. Its duties were only those which are to be implied from the relation of the parties, their purposes, and the circumstances and conditions under which the betting was carried on. We are unable to see that defendant was guilty of any breach of contract or any breach of duty, in cashing the tickets. It is clear, however, that defendant was under a duty not to allow upon its premise persons of known immoral character, such as the unnamed tout. Defendant's agents displayed a strange indifference to his presence, as well as a willingness to expose its patrons to his criminal activities in order to have his assistance in apprehending others of his kind. Such practices carry a responsibility for losses such as the one suffered by plaintiff. ██ However, plaintiff did not allege, nor did he attempt to prove negligence of defendant in failing to diligently police the track enclosure, and cannot now rely upon it.

The judgment is affirmed.

Wood (Parker), J., concurred.

Vallée, J., being disqualified, did not participate.

A petition for a rehearing was denied January 11, 1951, and appellant's petition for a hearing by the Supreme Court was denied February 15, 1951.