[No. B063912. Second Dist., Div. One. Mar. 11, 1993.]

JIM SZADOLCI et al., Plaintiffs and Appellants, v.
HOLLYWOOD PARK OPERATING CO. et al., Defendants and
Respondents.

**COUNSEL**

Laurence D. Strick for Plaintiffs and Appellants.

Irell & Manella, Alexander F. Wiles and Brian Pass for Defendants and Respondents.

OPINION

**ORTEGA, Acting P. J.**—We affirm the summary judgment granted in favor of defendants.

BACKGROUND

James Farenbaugh went to Hollywood Park on June 14, 1989, and put down $4,860 on a "Pick-9" ticket. A Pick-9 requires the bettor to pick the winners of the nine races run that day. Picking all nine winners results in a large return.

But Farenbaugh had something else in mind. He cancelled the ticket and bribed the pari-mutuel clerk to let him keep the worthless ticket. Farenbaugh then set out to sell shares in the ticket to other patrons at the track. The record does not reveal whether this was an ongoing scam by Farenbaugh. In any event, since the chance of hitting a big winner is remote, any shares sold would result in clear profit to Farenbaugh, who, having cancelled the ticket, had none of his own money at risk.

Plaintiffs Jim Szadolci and Daniel Teich bought into the ticket before the first race started. Each paid approximately $240 for a 5 percent share. Teich left the track shortly thereafter. Plaintiff Mardy Loewy apparently bought in for 5 percent after the day's racing program had commenced. The record is not clear at what point Loewy invested (he said probably after the second or third race) or how much he paid for his share (possibly around $300).

But, lo and behold, Farenbaugh (much to his dismay, we assume) picked all nine winners. A valid ticket would have paid $1,380,000. Farenbaugh's cancelled ticket was worth zero.

Szadolci and Loewy (jubilant, we presume, at the prospect of realizing $69,000 each) accompanied Farenbaugh (feigning aplomb, no doubt) to the pay window, only to learn of the ticket cancellation. Unfortunately, the record does not reveal what happened at that moment.

The three plaintiffs sued Hollywood Park, the pari-mutuel clerk, another track employee, and Farenbaugh for negligence, conspiracy, and negligent hiring. Defendants secured summary judgment, and plaintiffs appeal.

### STANDARD OF REVIEW

■ After examining the facts before the trial judge on a summary judgment motion, an appellate court independently determines their effect as a matter of law. (*Bonus-Bilt, Inc.* v. *United Grocers, Ltd.* (1982) 136 Cal.App.3d 429, 442 [186 Cal.Rptr. 357].)

Despite this independent review, the appellate court applies the same legal standard as did the trial court. Code of Civil Procedure section 437c, subdivision (c), requires the trial court to grant summary judgment if no triable issue exists as to a material fact, and if the papers entitle the moving party to a judgment as a matter of law. Emphasizing triable issues rather than disputed facts, summary judgment law turns on issue finding rather than issue determination. (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441-442 [116 P.2d 62].)

The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. (*Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 627 [157 Cal.Rptr. 248].) Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

The trial court's stated reasons supporting its ruling, however, do not bind this court. We review the ruling, not its rationale. (*Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219].)

### DISCUSSION

The trial court's ruling was based on the conclusion that the transactions between plaintiffs and Farenbaugh were illegal bets. Since plaintiffs' complaint relied on a theory which put them in pari delicto, the trial court held, they were barred from recovery. ■ " 'The general rule is that the courts will not recognize such an illegal contract [betting] and will not aid the parties thereto, but will leave them where it finds them. This rule has been rigidly enforced in this state to deny any relief in the courts to parties seeking to recover either their stakes or their winnings under a wagering contract which is in violation of law, . . . [Citations.]' [Citations.]" (*Bradley* v. *Doherty* (1973) 30 Cal.App.3d 991, 994 [106 Cal.Rptr. 725].)

■ Plaintiffs seek to distinguish themselves from the above rule by arguing that the transactions here did not constitute illegal bets. They argue that the trial court found these to be illegal "lay off bets" by erroneously relying on *People* v. *Oreck* (1946) 74 Cal.App.2d 215 [168 P.2d 186], which held that a "lay off man" was engaged in illegal bookmaking. What is a lay off bet/man? "If a customer of a bookie bets $5.00 on horse X to win a certain race, and the track odds are 5-1, if that horse wins the bookie must pay the customer $25, while if it loses the bookie wins $5.00. Now, if before the race, the bookie lays off that $5.00 bet with a lay off man, what is the result? If the horse wins, the bookie must pay the customer $25, but he is reimbursed to the extent of $25 by his bet with the lay off man. In a very real sense the bookie has won that bet with the lay off man, and the lay off man has lost. But if the horse loses, the bookie wins $5.00 from his customer, but he must pay the lay off man $2.50. In a very real sense the bookie has lost and the lay off man has won on that transaction. . . ." (*Id.* at pp. 220-221.)

But here, argue plaintiffs, unlike in *Oreck*, Farenbaugh's bet with the track was legal, so their investments did not constitute lay off bets. Farenbaugh possessed, they claim, a chose in action ("a right to recover money or other personal property by a judicial proceeding" (Civ. Code, § 953)), interest in which could be transferred. (See *Mattson* v. *Hollywood Turf Club* (1950) 101 Cal.App.2d 215 [225 P.2d 276], which holds there is at least an implied contract between the track and its bettors. *Mattson* also aptly points out that whether betting on horses "is a game of skill, as some believe, or of chance, as many have learned, it provides a legal method for getting rid of one's money." (*Id.* at p. 219.))

We agree that the transactions between Farenbaugh and plaintiffs did not constitute lay off bets, but for a different reason than proffered by plaintiffs. There was no underlying bet between Farenbaugh and any person or entity. Farenbaugh had withdrawn his legitimate bet and had no stake with the track in the outcome of the race, so he was laying nothing off when he fleeced plaintiffs. Farenbaugh had no chose in action. Plaintiffs bought a share of a worthless ticket, which entitled Farenbaugh and them to recover nothing from the track. If there was any kind of implied contract, it was between plaintiffs and Farenbaugh, who impliedly had offered plaintiffs a return if the selected horses won. A lay off bet provides a bookie with a backup. Farenbaugh, who could have used the help, had no backup.

Business and Professions Code section 19595 provides in part: "Any form of wagering or betting on the result of a horse race other than that permitted by this chapter is illegal." The basic approved betting format is for a bettor

to give his money to the track, where it is then placed in the pari-mutuel pool, out of which winning bettors are paid. (See Bus. & Prof. Code, § 19594—"Any person within the inclosure where a horse racing meeting is authorized may wager on the result of a horse race held at that meeting by contributing his money to the parimutuel pool operated by the licensee under this chapter. . . .") One of the advantages of this system is that it should eliminate the type of problem that occurred here.

Any way we look at it, plaintiffs laid direct wagers with Farenbaugh, who took their money and impliedly agreed to a 5 percent winner's share for each plaintiff. None of the money involved ended up in the pari-mutuel pool. So, while these were not lay off bets, they were unauthorized direct bets with Farenbaugh, and illegal.

Plaintiffs argue that these were not bets because Farenbaugh received no compensation, had no interest in the outcome of the races, and was on the same side as plaintiffs. But Farenbaugh had a very real stake in the outcome. For his scam to work, the ticket had to be a loser, because he could then offer his condolences to plaintiffs and walk away with their money. Only when the ticket "won" did Farenbaugh's problems arise. So, Farenbaugh was directly betting against plaintiffs. If their horses won, his scam was revealed and he acquired a measure of grief. If they lost, he kept several hundred dollars of plaintiffs' money without having risked one dime.

Plaintiffs offer the example of friends going to the track and pooling their money, with one of them purchasing the ticket. If the purchaser actually takes his friends' money and hands it to the pari-mutuel clerk, the bet is legal, plaintiffs argue, because the friends' money has been placed in the pari-mutuel pool. If he spends his own money and is then reimbursed by his friends, the bet is an illegal lay off bet according to defendants' analysis. This, plaintiffs argue, is illogical. But, since we have a different situation here, we need not analyze whether either of the above situations constitutes legal or illegal betting. Here, no one's money was in the pari-mutuel pool. There was no lay off bet. The transactions were direct and face-to-face between Farenbaugh and plaintiffs. Plaintiffs laid bets with Farenbaugh. The bets were not as authorized by the Business and Professions Code. They were illegal bets. Plaintiffs have no remedy. Whether the trial court relied on the wrong theory or not, its result was correct. (*Barnett* v. *Delta Lines, Inc.*, *supra*, 137 Cal.App.3d at p. 682.)

## Disposition

The judgment is affirmed.

Vogel (Miriam A.), J., and Aranda, J.,* concurred.

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.