[No. B145131. Second Dist., Div. Five. Apr. 24, 2002.]

PETER SEO, Plaintiff and Appellant, v.
ALL-MAKES OVERHEAD DOORS, Defendant and Respondent.

**COUNSEL**

Law Offices of Ronald M. Papell and Ronald M. Papell for Plaintiff and Appellant.

Aguilar & Sebastinelli and Robert A. Crook for Defendant and Respondent.

**OPINION**

**GRIGNON, J.**—A subtenant of commercial premises was injured when his arm was caught in a remote-controlled electronic sliding gate as he manually operated a toggle switch. The subtenant sued a gate repair company that had undertaken occasional as-needed repairs to the gate. The gate repair company moved for summary judgment on the ground it owed no duty to the subtenant to advise the owner of the property of design defects of the gate, unrelated to the repairs undertaken by the gate repair company. The gate repair company had not negligently repaired the gate, had not failed to make

any requested repairs, had not undertaken any repairs related to the alleged design defect, had not contracted with the owner of the property to inspect and maintain the gate, and had not voluntarily undertaken a systematic inspection of the sliding gate. We conclude the gate repair company did not owe a duty to the subtenant to warn the owner of the property of design defects unrelated to the repairs. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Susan Oh leased a unit in a commercial office building from the owner of the property. Plaintiff and appellant Peter Seo subleased part of the unit. The office building had an outdoor parking lot enclosed by a fence. Entry to, and exit from, the parking lot was through two sliding gates. The gates were controlled by electronic gate operators. The gates had been manufactured and installed by Larko Gate Company, which has ceased doing business. Plaintiff was injured at the entry gate.

During business hours, the entry gate remained open. Outside of business hours, tenants opened the gate with remote controls. The remote controls did not close the gate. Instead, the gate was on a timer and would close 20 seconds after it had been opened. If someone operated the remote control while the gate was open, the gate would remain open for an additional 20 seconds before automatically closing. On a control box inside the fence was a toggle switch, which was used to keep the gate open for extended periods, such as during business hours. When the gate was open, the toggle switch could be activated to prevent the gate from closing.

Plaintiff did not have a remote control to open the gate. When he needed to enter the property before the gate was opened for the day, he would either borrow Oh's remote control, follow another tenant through the gate, or ask a security guard to open the gate for him. After business hours on May 11, 1999, plaintiff drove his car out of the parking lot through the open entry gate. Plaintiff decided to close the gate behind him. From outside the fence, plaintiff reached his arm between the bars of the fence to operate the toggle switch on the control box. Plaintiff placed his arm between two vertical bars: a stationary bar of the fence and a moveable bar of the sliding gate. When plaintiff activated the toggle switch, the gate immediately began to close. The bars of the gate began to move, and plaintiff's arm was crushed between the gate bar and the fence bar.[1]

Defendant and respondent All-Makes Overhead Doors was a gate repair company, owned by Vincent Wimbish. Defendant was an independent contractor, not an employee or agent of the owner of the property. Defendant

---

[1]The precise details of the accident are not apparent from the record.

had neither manufactured nor installed the gate that injured plaintiff. Defendant had not installed the toggle switch. Defendant did not have a regular contract to service the gate for the owner of the property. Defendant had not agreed to warn the owner of the property of any design defects of the gate or install safety features that might have prevented plaintiff's accident. Defendant had repaired the sliding gate on occasion as needed. Defendant was not the only gate repair company to repair the gate. On April 16, 1999, another gate repair company replaced the toggle switch, which was damaged. However, if the gate required repair, the owner of the property generally contacted defendant. Defendant first repaired the gate in December 1996, after an automobile had struck the gate. Subsequent repair calls included a stuck electric lock (Feb. 1998), broken antennae (Mar. 1998), a tripped motor (Apr. 1998), a low voltage supply (July 1998), and an overheated brake switch (Apr. 1999). In 1999, defendant was called to the property on an average of once a month to repair the gate, assist with keys that did not fit, install a new entry gate next door, and weld walk-through gates. Whenever Wimbish was called to repair the gate, he checked the gate potentiometer, a safety device that controls the strength of the electric current.[2] Wimbish would not repair the gate unless the potentiometer was functional. Wimbish was aware of the possibility of injury if a person placed an arm between the bars of a sliding gate.

After the accident, the owner of the property contracted with defendant to install wire mesh over the bars of the gate and relocate the switch to a place unreachable from outside the gate.

On September 7, 1999, plaintiff brought this action for negligence against defendant gate repair company, the owner of the property, and the manager of the property.[3] Plaintiff alleged defendant had acted as an agent for the owner and the manager of the property in maintaining the electronic gates on the property. Plaintiff alleged three problems with the gate: a malfunction in the gate's electronic mechanism that allowed the gate to close immediately;[4] an absence of safety features, such as wire mesh, which would have prevented him from reaching through the bars; and the placement of the toggle switch in a location reachable from outside the fence. Plaintiff alleged defendant gate repair company had been negligent in failing to warn of or correct these defects.

[2]Plaintiff does not argue on appeal that the potentiometer was involved in his injury.

[3]The trial court granted the summary judgment motion of the owner and the manager of the property on the ground they had no actual or constructive notice of any dangerous condition of the gate. In an unpublished opinion filed concurrently with this opinion, we affirm the summary judgment.

[4]On plaintiff's appeal of the summary judgment in favor of defendant gate repair company, plaintiff has abandoned this theory of negligence.

Defendant moved for summary judgment on the ground it owed no duty to plaintiff to warn the owner of the property of or correct any design defects of the gate. In opposition, plaintiff argued defendant had a legal duty to warn or repair because of defendant's superior knowledge of the gate and its dangers. Plaintiff also argued defendant had undertaken a duty to inspect and repair the gate on a regular basis, in light of its monthly repair calls and Wimbish's regular inspection of the potentiometer. The trial court granted defendant's motion for summary judgment. Plaintiff moved for reconsideration, arguing defendant had undertaken the duty of inspection and repair owed to plaintiff by the owner of the property. The trial court denied plaintiff's motion for reconsideration. Judgment was entered in favor of defendant. This timely appeal followed.

DISCUSSION

*Standard of Review*

■ "The policy underlying motions for summary judgment and summary adjudication of issues is to ' "promote and protect the administration of justice, and to expedite litigation by the elimination of needless trials." ' " (*Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 323 [39 Cal.Rptr.2d 296].)

"Any party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a).) The motion and the opposition to the motion "shall be supported by affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken." (*Id.*, subd. (b).) Separate statements setting forth plainly and concisely all material facts which the parties contend are undisputed must be included. (*Ibid.*) "Evidentiary objections not made at the hearing shall be deemed waived." (*Ibid.*) "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence . . . and all inferences reasonably deducible from the evidence, except summary judgment shall not be granted . . . on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (*Id.*, subd. (c); *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1028 [37 Cal.Rptr.2d 431].)

■ A defendant or cross-defendant meets his or her burden upon a motion for summary judgment or summary adjudication if that party has

proved "one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (*o*)(2).) The defendant need not conclusively negate an element of the plaintiff's cause of action, but must only show that one or more of its elements cannot be established. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [26 Cal.4th 80a, 107 Cal.Rptr.2d 841, 24 P.3d 493].) The burden of proof at trial is relevant to the burden of production borne by the defendant moving for summary judgment. "[I]f a defendant moves for summary judgment against [a plaintiff who would bear the burden of proof by a preponderance of evidence at trial], he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not." (*Id.* at p. 851, original italics.)

"Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists . . . ." (Code Civ. Proc., § 437c, subd. (*o*)(2).) In opposing the motion, the plaintiff or cross-complainant may not simply rely upon allegations or denials of the pleadings; the plaintiff or cross-complainant must set forth specific facts showing that a triable issue of material fact exists. (*Ibid.*; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580-581, 593 [37 Cal.Rptr.2d 653].)

"There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.) Although "the court may not weigh the plaintiff's evidence or inference against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.*" (*Id.* at p. 856, original italics.) "If [the] party moving for summary judgment . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination," the motion should be granted. (*Id.* at p. 855.)

■ On appeal, we exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].) "The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. [Citation.] Moreover, we construe the moving party's affidavits strictly,

construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it." (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356]; accord, *Lorenzen-Hughes v. MacElhenny, Levy & Co.* (1994) 24 Cal.App.4th 1684, 1686-1687 [30 Cal.Rptr.2d 210].)

*Duty*

■ Plaintiff contends defendant was negligent in failing to inform the owner of the property that the sliding gate/toggle switch combination was defectively designed, and in failing to suggest safety measures that would have prevented the accident, such as installation of wire mesh and relocation of the toggle switch. Defendant responds that it owed no duty to the owner of the property to advise of design defects or potential safety measures unrelated to its repair work.

■ " 'Actionable negligence is traditionally regarded as involving the following: (a) a *legal duty* to use due care; (b) a *breach* of such legal duty; (c) the breach as the *proximate or legal cause* of the resulting injury.' " (*Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1837 [20 Cal.Rptr.2d 913].) " 'While breach of duty and proximate cause normally present factual questions, the existence of a legal duty in a given factual situation is a question of law for the courts to determine. [Citation.]' " (*Id.* at p. 1838.)

■ In considering whether a party has a legal duty in a particular factual situation, a distinction is drawn between claims of liability based upon misfeasance and those based upon nonfeasance. " ' "Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention. . . ." [Citations.]' " (*Jackson v. Ryder Truck Rental, Inc., supra,* 16 Cal.App.4th at p. 1838.) Liability for misfeasance is based on the general duty of ordinary care to prevent others from being injured by one's conduct. (Civ. Code, § 1714, subd. (a); *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36].) Liability for nonfeasance is limited to situations in which there is a special relationship that creates a duty to act. (*Eric J. v. Betty M.* (1999) 76 Cal.App.4th 715, 717 [90 Cal.Rptr.2d 549]; *Jackson v. Ryder Truck Rental, Inc., supra,* 16 Cal.App.4th at p. 1838.) "The basic idea is often referred to as the 'no duty to aid rule,' which remains a fundamental and long-standing rule of tort law. . . . 'As a rule, one has no

duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' " (*Eric J. v. Betty M., supra,* 76 Cal.App.4th at p. 727.) Because the traditional weighing process using the seven factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], "has already been done by courts over the centuries in formulating the 'no duty to aid' rule" in the context of liability for nonfeasance, it is not necessary to engage in the weighing process in a particular case. (*Eric J. v. Betty M., supra,* 76 Cal.App.4th at pp. 729-730.)

■ "[T]he common law concept of special relationships covers: landowner or possessor and person coming on the land; manufacturer or supplier of goods and buyer or user; vendor, lessor, or contractor and purchaser, lessee or owner of real property." (*Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 712 [230 Cal.Rptr. 823].) It also " 'refers to such additional relationships [giving rise to affirmative duties] as common carrier and passenger . . . , innkeeper and guest . . . , and a person who is required by law to take, or who voluntarily takes, custody of another under circumstances that deprive the other of his normal opportunities for protection.' " (*Id.* at pp. 712-713.) Other special relationships requiring affirmative action include psychotherapists and patients; law enforcement and particular members of the public; parties with a relationship of dependence; proprietors of bowling alleys, restaurants, apartment houses, and hospitals and their customers; and school districts and students. (*Id.* at pp. 713-715.) A special relationship may also arise out of a statutory duty or a contractual duty. (6 Witkin, Summary of Cal. Law (9th ed. 1990) Torts, § 859, p. 223.) Finally, it may arise out of a voluntary assumption of a duty upon which a person reasonably relies. (*Id.* at § 872, p. 238.) If a special relationship arises out of a contractual duty, the duty is owed not only to the parties to the contract but also to those persons intended to be benefited by the performance of the contract. (*Id.* at § 889, p. 260.)

*Nonfeasance*

■ Plaintiff alleges that defendant gate repair company failed to take action to warn of or correct a dangerous design defect of the sliding gate/toggle switch combination. This failure to act constitutes classic nonfeasance. Defendant did not manufacture or install the gate or toggle switch. Defendant did not negligently repair the gate or fail to make requested

repairs. (Cf. *Dahms v. General Elevator Co.* (1932) 214 Cal. 733, 734-737, 741 [7 P.2d 1013] [elevator repair company negligently repaired elevator hoisting shaft, hoisting sheave and governor cable, which malfunctioned injuring plaintiff elevator operator].) Defendant never repaired the toggle switch. Accordingly, defendant owed no duty to plaintiff in the absence of a special relationship. Plaintiff argues a special contractual relationship with the owner of the property existed, defendant voluntarily assumed a duty on which the owner of the property relied, and defendant owed plaintiff a duty as an independent contractor repairer. We address each of these arguments.

*Contractual Duty*

A special relationship may arise out of a contract in which a repair company agrees for a fee to keep a piece of equipment in repair, perform all work necessary for the safety and maintenance of the equipment, and make periodic inspections of the equipment. (*Dahms v. General Elevator Co., supra,* 214 Cal. at pp. 734, 737; *Jackson v. Ryder Truck Rental, Inc., supra,* 16 Cal.App.4th at pp. 1835, 1838.) The evidence is undisputed that defendant had entered into no such written contract with the owner of the property. Nor was there any evidence of such an oral contract. The evidence is undisputed that the owner of the property called defendant gate repair company on those occasions the gate or some other similar equipment needed specific repairs.

Plaintiff argues an implied contract to regularly inspect and maintain the gate arose from defendant's repeated visits to the property, monthly in 1999, and Wimbish's testing of the potentiometer safety device every time he repaired the gate. We are not persuaded by this argument. Defendant was called to work at the property on an as-needed basis. Although the calls were monthly in 1999, many of the calls did not involve the entry gate. In any event, each of the calls was to make specific repairs. Defendant made the requested repairs. None of those requested repairs caused plaintiff's injuries. It is true that Wimbish checked the potentiometer before he worked on the gate, but this particular safety device was not involved in plaintiff's injury. Neither the frequency of the repair calls nor the inspection of the potentiometer gives rise to an inference of an implied contract between the owner of the property and defendant to regularly inspect and maintain the gate. No other evidence of an implied contract was presented.

*Voluntary Assumption of Duty*

██ In a similar vein, plaintiff argues defendant voluntarily assumed a duty to systematically inspect and maintain the gate on which the owner of

the property relied. Plaintiff argues defendant voluntarily undertook to assume the owner's duty to keep the gate safe. (Cf. *Barbaria v. Independent Elevator Co.* (1956) 139 Cal.App.2d 474, 477, 484 [293 P.2d 855] [no evidence elevator inspector hired by insurance company voluntarily undertook the owner's duty to keep the elevator safe].) In support of this argument, plaintiff proffers the same evidence of frequency of repair calls and voluntary inspection of the potentiometer. As we discussed in connection with the implied contractual duty issue, we conclude there is no evidence defendant voluntarily assumed the owner's duty to maintain the gate in a safe condition or voluntarily undertook a systematic inspection of the gate.

*Duty of Repairer*

Finally, plaintiff contends defendant owes him a duty to warn the owner of the property of the design defect of the gate by virtue of defendant's status as an independent contractor called upon to make repairs to the gate. More generally, plaintiff argues an independent contractor repairer has a duty to third parties to warn the owner of design defects of the equipment repaired, unrelated to the repairs made. Since this case involves only nonfeasance and defendant and plaintiff fall into none of the recognized "special relationships," plaintiff essentially requests that we adopt a new category of special relationship creating a duty of repairers to third parties. This we decline to do. Any duty of the repairer arises out of its contract with the owner to repair the equipment for a specified fee and no justification exists to extend that contractual duty beyond the intent of the contracting parties. That the repairer has superior knowledge and may recognize the design defect is not sufficient in and of itself to create a duty to third parties.

Imposition of a duty on repairers to warn of design defects or incur liability to third parties injured by those defects would impose a substantial additional burden on repairers and those who hire them. No repairer could be hired simply to repair a single defect in a mechanical device without the repairer potentially incurring liability to anyone who might use the device. The cost of simple repairs would increase significantly, as every repairer would factor into the charge for a service call the additional cost of inspection, advisement, insurance, and liability. An automobile mechanic could not perform a simple oil change without a complete inspection for any design defect of the automobile and the preparation of a complete advisement of defects to the owner. A plumber could not fix a leaky faucet without inspecting the entire fixture and advising the owner of any ways in which the fixture might be defective. It is possible that repairs of certain high-risk mechanical devices could not be obtained in light of the increased potential

for liability on the part of the repairer. Thus, the creation of a new category of special relationship for repairers and third parties injured by the equipment in order to create a duty for nonfeasance does not appear to be based on sound public policy.

This conclusion is buttressed by the fact that every other jurisdiction that has considered the question has found no special relationship and no duty. (*Barry v. Stevens Equipment Company* (1985) 176 Ga.App. 27 [335 S.E.2d 129, 131-132] [independent contractor repairer who was not retained to modify shear machine had no duty to correct or warn of a defect of the machine based on superior knowledge alone]; *Sculles v. American Environmental Products, Inc.* (1992) 227 Ill.App.3d 741 [169 Ill.Dec 784, 592 N.E.2d 271, 273] [as-needed repair service company had no duty to warn of potential hazards of commercial baler when it had not contracted to look for safety hazards]; *Spears v. Sanchez* (La.Ct.App. 1968) 207 So.2d 791, 793 [no duty imposed on service station hired to change the oil in an automobile to warn the owner of a defect of the car's hood]; *Ayala v. V&O Press Company* (1987) 126 A.D.2d 229 [512 N.Y.S.2d 704, 705] ["in the absence of any contractual duty to service a given product on a continual or periodic basis, a repairer should not be subjected to liability based on the failure to warn of a design defect"]; *Risk v. Woeste Eastside Motors, Inc.* (1997) 119 Ohio App.3d 761 [696 N.E.2d 283] [mechanic's scheduled 90,000-mile service of a car does not include the duty to inform driver of other recommended services].)

*Conclusion*

■ An independent contractor repairer may owe a duty to a third party injured by the equipment repaired if: (1) the repairer negligently performs the repair causing the third party's injury; (2) the repairer negligently fails to make a requested repair causing the third party's injury; (3) the repairer has contracted with the owner to inspect and maintain the equipment and fails to do so or to do so properly; or (4) the repairer has voluntarily assumed the owner's duty to inspect and maintain the safety of the equipment or undertaken a systematic inspection of the equipment and fails to do so or to do so properly. The independent contractor repairer owes no duty to a third party injured by equipment repaired by the contractor where the injury does not arise out of the repair and is unrelated to the repair. Such a repairer owes no duty to a third party to inspect the equipment and advise the owner of any design defects of the equipment. The responsibility for such design defects properly lies with the manufacturer and installer of the equipment and the owner to the extent the owner is on notice of the design defect. Here, the repairer owed no duty to the injured third party.

## Disposition

The judgment is affirmed. Defendant is awarded its costs on appeal.

Turner, P. J., and Armstrong, J., concurred.