Filed 5/29/24  Pico Rivera First Mortgage Investors v. Aguila CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| PICO RIVERA FIRST MORTGAGE INVESTORS, LP,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>v.<br><br>HENRY AGUILA,<br><br>    Defendant, Cross-complainant and Appellant;<br><br>WOLF BASCHUNG,<br><br>    Cross-defendant and Respondent. | 2d Civ. No. B322020<br>(Super. Ct. No. 18CV04958)<br>(Santa Barbara County) |

This is a continuation of a case in which Henry Aguila's corporation, Thee Aguila, Inc. (TAI), lost real property to foreclosure.  After foreclosure, the lender sued Aguila on his personal guarantee of the loan.  Aguila cross-complained against

the lender, the real estate broker who arranged the post-foreclosure sale of the property, and numerous others. Aguila eventually entered into a settlement with the lender, stipulating to a judgment against him in excess of $3.8 million.

Here Aguila appeals an order denying his motion to vacate the stipulated judgment. He also appeals a judgment in favor of the real estate broker on his (Aguila's) cross-complaint. The judgment resulted from the sustaining of the broker's demurrer on most causes of action without leave to amend and the granting of the broker's motion for summary judgment on the remaining cause of action. We affirm.

## FACTS

TAI owned real property in Pico Rivera, California (the Property). Aguila is the sole owner of TAI. The Property had been leased for use as a nightclub and restaurant. In 2015, the Drug Enforcement Agency seized the liquor license because the tenant was using the Property to launder money for a Mexican drug cartel. The business's conditional use permit (CUP) was revoked, and the business was shut down. The Department of Alcoholic Beverage Control (ABC) refused to issue a new liquor license until the city issued a new CUP. Aguila began work to obtain a new CUP.

### *Loan and Foreclosure*

In July 2015, TAI obtained a loan of $5.7 million from Pico Rivera First Mortgage Investors, LP (First Mortgage). The loan was secured by a trust deed that encumbered the Property. Aguila personally guaranteed the loan in writing.

TAI failed to make payments on the loan, and First Mortgage began foreclosure proceedings in August 2017. On

December 6, 2017, a non-judicial foreclosure sale was conducted, and First Mortgage became the Property's owner.

*Underlying Litigation*

In October 2018, First Mortgage filed an action against Aguila for breach of his personal guarantee of the loan. Aguila, a former attorney, answered and filed a cross-complaint against First Mortgage, its principal Carl Lindros, and numerous others, including Wolf Baschung, the real estate agent retained to sell the Property. The cross-complaint was based on an alleged oral contract between First Mortgage and Aguila to allow Aguila one year from the foreclosure sale to fulfill his financial obligations to First Mortgage and receive the Property back, or arrange for the sale of the Property, and keep the net proceeds. Aguila refers to the oral agreement as the "option contract." Guinevere Malley represented TAI in portions of the underlying litigation.

First Mortgage and Aguila settled the action. The settlement agreement provided that a judgment would be entered against Aguila in the amount of $3,867,113.84. The agreement contained a covenant not to sue and a general release that encompassed First Mortgage, TAI, Aguila and their attorneys.

At the time the parties entered into the settlement agreement First Mortgage had a motion pending in an unrelated bankruptcy filed by Malley. It was Aguila's undisclosed intention in entering into the settlement agreement to sue First Mortgage for breach of the covenant not to sue and general release if First Mortgage completed the pending motion in Malley's bankruptcy.

*Instant Action Against First Mortgage*

After First Mortgage successfully completed its motion in Malley's bankruptcy, Aguila brought the instant action against First Mortgage for breach of the settlement agreement. First

3

Mortgage responded with a motion pursuant to Code of Civil Procedure section 425.16 (anti-SLAPP [strategic lawsuit against public participation] motion).

The trial court granted the motion and dismissed Aguila's action against First Mortgage. In granting the motion, the court determined Aguila could not succeed because the motion in Malley's bankruptcy was not encompassed within the settlement agreement's covenant not to sue and general release. We affirmed. (*Aguila v. Pico Rivera First Mortgage Investors LP et al.* (Oct. 16, 2023, B323391) [nonpub. opn.] (*Aguila I*).)

After Aguila lost the anti-SLAPP motion, he moved to vacate the stipulated judgment against him contained in the settlement agreement. His theory was that the settlement agreement is void. He claims his undisclosed intention that the covenant not to sue and general release encompassed Malley's bankruptcy means there was no meeting of the minds necessary for a valid contract. The trial court denied the motion. Aguila appeals.

*Instant Action Against Baschung*

*Second Amended Complaint*

Aguila's second amended cross-complaint against Baschung alleged as follows:

TAI owned the Property. Aguila obtained a loan for $5.7 million from First Mortgage. The loan was secured by a trust deed on the Property. At the time Aguila obtained the loan, the Property was appraised for $10 million.

In May 2017, TAI entered into a listing agreement with Baschung's real estate firm to sell the Property for $10.5 million. By December 4, 2017, Aguila had obtained a new CUP for the operation of a restaurant and nightclub on the Property and had

4

satisfied the ABC's conditions for a liquor license. First Mortgage foreclosed three days later and obtained title to the Property at the foreclosure sale.

Aguila informed First Mortgage that the entitlements he obtained for the Property increased its value by over $5 million. First Mortgage represented that Aguila would be permitted enough time to close a transaction with a buyer who could take advantage of the entitlements.

On December 19, 2017, First Mortgage through Baschung received an offer to purchase the Property from Blackwood LLC. First Mortgage informed Baschung of the option contract and requested that he submit the offer to Aguila. Aguila told Baschung that the offer was unacceptable, and that Baschung was to cease all communication with First Mortgage.

First Mortgage, with the assistance of Blackwood LLC, conspired with Baschung to exclude Aguila from any sale of the Property. First Mortgage, with Baschung's complicity, entered into a new letter of intent to sell the Property to Blackwood LLC.

Aguila's second amended complaint alleged several causes of action against Baschung. Relevant to this appeal are causes of action for breach of fiduciary duty and interference with prospective economic advantage.

(a) *Demurrer: Breach of Fiduciary Duty*

Baschung demurred to the second amended cross-complaint. The second amended cross-complaint showed the listing agreement was between Baschung and TAI, not between Baschung and Aguila. Thus Baschung owed Aguila no duties. The trial court sustained the demurrer as to the cause of action for breach of fiduciary duty. Aguila presented a proposed third amended cross-complaint. But the proposed third amended

5

cross-complaint did not resolve the issue on which the demurrer was based. The court sustained the demurrer without leave to amend.

(b) *Summary Judgment:*

*Interference with Prospective Economic Advantage*

Prior to the foreclosure, Baschung presented Aguila, on behalf of TAI, with three letters of intent to purchase the Property at between $5.25 million and $6 million. Three other potential buyers expressed interest in purchasing the Property for $5 million. TAI did not accept any of those offers.

Aguila admitted that "he never told Baschung the terms of the option contract" and "the only people who needed to know about the option contract were he and [Carl] Lindros." Lindros did not tell Baschung of the option contract.

After the foreclosure, Lindros told Baschung that if the Property was being sold by First Mortgage "Aguila would be involved." Baschung presented Aguila with a letter of intent from Blackwood LLC to purchase the Property. Aguila did not accept the terms. Baschung presented another letter of intent to purchase by Blackwood LLC to Aguila, but Aguila did not accept it either.

Blackwood LLC submitted a third letter of intent to Baschung, who provided it to Aguila. Aguila did not respond to Baschung's e-mail but called Baschung to express displeasure at Baschung bringing him low offers.

Blackwood LLC sent a fourth letter of intent to Baschung which was forwarded to Aguila. Aguila did not respond. After Aguila did not accept any of Blackwood LLC's offers, Baschung began to work directly with First Mortgage to sell the Property without Aguila's input.

6

Eventually Blackwood LLC entered into escrow with First Mortgage. But Blackwood LLC cancelled escrow when it learned from a neighboring property owner that the Property was encumbered with an undisclosed easement. Blackwood LLC believed that the easement would interfere with its plans to develop the Property.

Baschung continued to work with First Mortgage without Aguila. In 2019, First Mortgage received 11 offers to purchase the Property, but none were accepted due to price, the qualifications of the buyer, or issues relating to the easement. The listing price for the Property was lowered to $4.3 million. Finally, First Mortgage sold the Property to a neighboring property owner for $4.4 million.

### *Ruling on Summary Judgment Motion*

The trial court granted Baschung's motion for summary judgment.

The trial court found: "Baschung has met his initial burden on summary judgment. First, because the economic relationship at issue is alleged as premised upon the option contract, Baschung negates the second element of this cause of action by presenting evidence that Baschung did not know of the option contract or its terms . . . . Second, Baschung has presented evidence that Baschung's activity did not interfere with the alleged economic relationship. Baschung presents evidence that the Blackwood [LLC] transaction terminated without a sale of the [P]roperty as a result of an undisclosed easement issue . . . , and that Baschung presented offers to Aguila that were not accepted . . . . Thus, the conduct of Baschung in the ultimate sale of the [P]roperty at a lower price than offers presented to but rejected by Aguila did not interfere in any potential interest of

7

Aguila in the [P]roperty. . . . This evidence negates the elements of actual disruption and economic harm proximately caused by Baschung's conduct."

Because Baschung met his initial burden, the burden shifted to Aguila to show the existence of a triable issue of material fact. The trial court found Aguila could not do so.

DISCUSSION

### I. Aguila v. First Mortgage: Motion to Vacate Judgment

Aguila's appeal of the trial court's denial of his motion to vacate the judgment is governed by the law of the case. The law of the case doctrine provides that when the decision of an appellate court states a rule of law necessary to the case, the decision conclusively establishes the rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal of the same case. (*Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309.) The doctrine applies to questions that were implicitly determined because they were essential to the prior decision. (*Ibid*.)

We did not decide in *Aguila I*, *supra*, B323391, that there was no meeting of the minds necessary for a valid settlement agreement. Instead, we held that First Mortgage's motion in an unrelated bankruptcy proceeding was not encompassed by and did not breach the settlement agreement. We also held that Aguila's undisclosed intention to hold First Mortgage liable for the motion shows he entered into the agreement in bad faith and with the intent to deceive.

Now Aguila wishes to use his own bad faith and intent to deceive in an effort to escape the burdens of a valid judgment against him. As we said in *Aguila I*, *supra*, B323391, we refuse to assist his bad faith. Aguila's undisclosed subjective intent is

8

irrelevant to the formation of a valid contract. (See 1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts § 116, p. 157 [mutual consent to contract is gathered from the words of the parties, not their unexpressed intentions]; *Zurich General Accident & Liability Assurance Company Ltd. v. Industrial Accident Commission* (1933) 132 Cal.App. 101, 104.) The trial court properly denied the motion to vacate the settlement agreement.

## II. Aguila v. Baschung

### (a) Demurrer

Aguila contends the trial court erred in sustaining Baschung's demurrer without leave to amend to the cause of action alleging breach of fiduciary duty.

The function of a demurrer is to test whether, as a matter of law, the facts alleged in the complaint state a cause of action under any legal theory. (*Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1052.) We assume the truth of all facts properly pleaded, as well as facts of which the trial court properly took judicial notice. (*Ibid*.) But we do not assume the truth of contentions, deductions, or conclusions of law. (*Ibid*.) Our review of the court's decision is de novo. (*Ibid*.)

We review the trial court's decision to allow an amendment to the complaint for an abuse of discretion. (*Fontenot v. Wells Fargo Bank, N.A.* (2001) 198 Cal.App.4th 256, 273.) Where there is no reasonable possibility that plaintiff can cure the defect with an amendment, sustaining a demurrer without leave to amend is not an abuse of discretion. (*Id*. at p. 274.)

The trial court sustained the demurrer on the ground that Baschung owed a fiduciary duty to TAI as the contracting party and owed no duty to Aguila. (See *Coldwell Banker Residential*

9

*Brokerage Co. v. Superior Court* (2004) 117 Cal.App.4th 158, 165-166 [broker owed no duty to children of buyer].)

Aguila does not argue with the trial court's conclusion.  He claims, however, that the court abused its discretion in not granting him leave to amend.  But Aguila's proposed third amended cross-complaint did not address the defect on which the demurrer was sustained.  The court reasonably concluded that Aguila could not cure the defect.

For the first time on appeal Aguila suggests an amendment he believes can cure the defect.  Aguila would amend his complaint to allege the following:

"[W]hen Baschung was informed by Lindros (the principal of [First Mortgage]), after the December, 2017 purported nonjudicial foreclosure sale of the Property to [First Mortgage], that Aguila, personally, was to be involved in any future sale of the Property, the existing Listing Agreement originally entered into in May, 2017 with TAI, was orally amended by Aguila and Baschung to include Aguila, personally.  This was done simultaneously with Aguila agreeing to be obligated to Baschung and Keller Williams for commissions from any sale of the Property arising from an offer brought directly to Aguila.  The purpose of the oral amendment was so that Baschung and Keller Williams did not have to worry about their commission if they brought offers directly to Aguila after TAI was purported to have lost title to the Property following the nonjudicial foreclosure sale in December, 2017."

Aguila cites *Mercury Insurance Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1072, for the proposition that a party may for the first time on appeal show how he can amend his pleading to

10

cure the defect on which the demurrer was sustained. But amendments to pleadings must stop somewhere.

Aguila has filed a cross-complaint, two amended cross-complaints, and a proposed third amended cross-complaint. Even after the sustaining of the demurrer alerted him to the precise defect in his pleading, the proposed third amended cross-complaint did not cure the defect. Aguila presents no reason why he could not have alleged his oral contract with Baschung as far back as his original cross-complaint. To allow him to do so now would be highly prejudicial to Baschung.

There is another reason for not allowing the third amended complaint. After multiple rounds of pleading, a sustained demurrer, and a proposed third amended complaint, Aguila remembers while the case is on appeal that he had an oral contract with Baschung. Aguila's proposed third amended complaint carries all the earmarks of a sham pleading. The sham pleading doctrine precludes plaintiffs from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers. (*Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 344.) The policy against sham pleading applies here. Aguila provides no explanation for why he did not allege the oral contract with Baschung in his original or amended cross-complaints or even in his proposed third amended cross-complaint after the trial court sustained the demurrer.

### (b) Summary Judgment

Summary judgment is properly granted only if all papers submitted show there is no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The court must draw all

11

reasonable inferences from the evidence set forth except where such inferences are contradicted by other inferences or evidence that raises a triable issue of fact. (*Ibid*.) In examining the supporting and opposing papers, the moving party's affidavits or declarations are strictly construed and those of its opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19.)

The moving party has the initial burden of showing that one or more elements of a cause of action cannot be established. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763.) Where the moving party has carried that burden, the burden shifts to the opposing party to show a triable issue of material fact. (*Ibid*.) Our review of the trial court's grant of the motion is de novo. (*Id*. at p. 767.)

The elements of a cause of action for intentional interference with prospective economic advantage are: " ' " '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship.' " '. . . With respect to the type of intentional disruptive acts that are actionable, they must be wrongful by some independent legal measure, beyond interference. . . . [¶] Next, an intentional interference claim requires setting forth facts of ' " '(4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.' " ' " (*Golden Eagle Land Investment, L.P. v.*

12

*Rancho Santa Fe Assn.* (2018) 19 Cal.App.5th 399, 429-430 (*Golden Eagle*), italics and citations omitted.)

The trial court concluded that Baschung had established a prima facie case, thus the burden shifted to Aguila to show a triable issue of material fact. Aguila failed to do so on at least two of the elements of interference with prospective economic advantage:

It is undisputed that Baschung had no knowledge of the alleged oral option contract. In response to Baschung's separate statement of material facts, Aguila acknowledged the following facts are undisputed.

Aguila only discussed the option contract with Lindros by telephone and did not think a written agreement was necessary.

Aguila never told Baschung the terms of the option contract.

Aguila testified in his deposition that the only people who needed to know about the option contract were himself and Lindros.

Aguila never told Baschung about his plan to bring together investors to purchase the Property.

Lindros told Baschung that Aguila would be "involved" in the sale of the Property, but he did not tell Baschung about the option contract.

Baschung was unaware of the terms of the option contract.

It is undisputed that neither Aguila nor Lindros told Baschung the terms of the option contract. Aguila admitted no one needed to know about the option contract but himself and Lindros. At most, Lindros told Baschung that Aguila would be involved in the sale. Being involved in the sale could mean anything. Being told that Aguila would be involved in the sale is

13

not sufficient to advise Baschung that Aguila had an option contract.

Aguila contends there is additional evidence that is not included in the separate statement. He claims that the trial court relied on his deposition testimony that he never told Baschung the terms of the agreement to conclude Baschung had no knowledge of the agreement. Aguila argues that the portion of his deposition only shows that he did not tell Baschung; it does not show what Lindros did not tell Baschung. Aguila points to a portion of his deposition immediately prior to the portion on which Baschung relies. Aguila testified as follows:

"[Baschung's counsel]: Okay. I won't ask you about attorneys. And then on [Lindros's] end, did he ever tell you that he told anyone else about this agreement, the deal that had been made with you apparently? [Aguila]: I never asked him that question. [Baschung's counsel]: And so the answer would be no, he never told you that he had explained this agreement to anyone else, right? [Aguila]: He told Gilad and [Baschung] that he made a deal with me, but I don't think he told them the terms."

Aguila argues that his deposition testimony directly contradicts Baschung's claim that he had no knowledge about any agreement between him (Aguila) and First Mortgage. Aguila's argument is unavailing.

First, Baschung did not claim he had no knowledge of any agreement between Aguila and First Mortgage. Baschung claimed he had no knowledge of the terms of an agreement. The portions of the deposition on which Aguila relies confirm, rather than contradict, Baschung's claim. There is simply no evidence Baschung knew that Aguila was claiming an option in the Property.

14

Second, Aguila concedes the portion of his deposition on which he now relies was not included in the separate statement. Contrary to Aguila's assertion, for which he cites no authority, the trial court has no duty to independently search the record for evidence that might assist him in raising a triable issue of fact.

Aguila's reliance on *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308 is misplaced. Aguila cites the case for the court's statement that it rejects the absolute prohibition on the consideration of evidence not referenced in the separate statement. (*Id*. at p. 315.) What Aguila fails to acknowledge is that the exception is quite narrow. The exception only applies where even the most cursory review of the moving papers shows the motion to be utterly without merit. (*Id*. at p. 316.) That is far from the case here.

Baschung obviously had notice that there was some agreement between First Mortgage and Aguila. But he had no notice of the terms of the agreement. Baschung simply had insufficient information to hold him liable for intentional interference with prospective economic advantage.

The trial court had a second independent reason for granting Baschung summary judgment. It is not enough to show the possibility of future economic benefit to the plaintiff; the plaintiff must show the probability of future economic benefit. (*Golden Eagle*, *supra*, 19 Cal.App.4th at p. 429.)

For Aguila to receive an economic benefit from the sale of the Property, the sales price would have to exceed $5.7 million plus accrued interest and transactional costs. Aguila received multiple offers but none from a ready, willing, and able buyer who made an offer satisfactory to Aguila. First Mortgage also received multiple offers. But the highest price it could obtain

15

from a ready, willing, and able buyer was $4.4 million.  That buyer owned the neighboring dominant parcel; thus he would not be concerned with the problematic easement.

Because Aguila obtained a CUP and made improvements to satisfy the ABC, he believes the Property is worth $10 million to someone who wants to operate a restaurant and bar.  But Aguila points to no such ready, willing, and able buyer.  It is pure speculation to say that one exists.  Nor does Aguila explain why any such buyer would be willing to pay $10 million for a property he could obtain for under $5 million with the CUP and improvements already in place.

The trial court properly granted the summary judgment.[1]

## DISPOSITION

The order denying the motion to vacate the judgment and the judgment are affirmed.  Costs are awarded to respondents.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


YEGAN, J.


CODY, J.

---

[1] First Mortgage does not raise the issue of the lack of an independent legal wrong beyond the interference itself as a basis for summary judgment.

16

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____

The Tym Firm and Ronald D. Tym for Defendant, Cross-complainant and Appellant Henry Aguila.

Law Office of Eric A. Woosley and Eric A. Woosley for Plaintiff, Cross-defendant and Respondent Pico Rivera First Mortgage Investors, LP.

Zelms Erlich & Mack, Rinat Klier-Erlich and Brian T. Smith, for Cross-defendant and Respondent Wolf Baschung.